FREDERICK O. VEGELAHN *vs.* GEORGE M. GUNTNER & others.

Suffolk.     March 24, 1896. — October 26, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Conspiracy to interfere with Person's Business — Maintaining Patrol in Front of Premises — Intimidation — Nuisance — Equity — Injunction.*

Maintaining a patrol of two men changed every hour in front of a person's premises, as part of a conspiracy to interfere with his business until he shall adopt a certain schedule of prices, in combination with persuasion, social pressure, and threats of personal injury or unlawful harm conveyed to persons employed by him or seeking such employment, amounts to intimidation, and constitutes a private nuisance which equity will restrain by injunction ; and such injunction will issue, although the acts enjoined may be criminal, and are designed only to affect persons who are not bound by contract to enter into or to continue in the employment. FIELD, C. J., & HOLMES, J., dissenting from an injunction against (1) the patrol dissociated from threats of physical injury to person or property, and (2) any combined attempt to injure the business, although without such threats and irrespective of the means employed.

BILL IN EQUITY, filed December 7, 1894, against fourteen
individual defendants and two trades unions, alleging that the
plaintiff was engaged in business as a manufacturer of furniture,
in the premises numbered 141, 143, 145, and 147 North Street,
in Boston, and employed a large number of men in carrying on
his business there, that there were in Boston certain associa-
tions named as defendants, which were composed of persons
engaged in similar occupations to that of the individual defend-
ants, of whom the defendant Guntner was agent; that on or
about October 11, 1894, the plaintiff received a communication
from the defendant unions as follows: " Your upholsterers do
hereby kindly submit enclosed Price-list for your earnest consid-
eration, the object is to institute a more equal competition this
we would asked to go into effect on and after Oct. 29, 1894, and
we kindly request that after said date Nine hours constitute a
day's work ", that on or about November 21, 1894, without
notice and without warning, all of the individual defendants,
except Guntner, struck, and left the plaintiff's employment and
premises in a body; that since that date the plaintiff had en-
deavored to carry on his business, and to employ other men to
fill the places of the defendants, but the defendants, their agents
and servants, had wilfully and maliciously patrolled the streets
in front of his premises in groups and squads continuously, and
had used indecent language and epithets to those working in his
employ in the places made vacant by the defendants, that they
had wilfully and maliciously blocked up the doorway and en-
trance of his premises, and there intercepted, interfered with,
and intimidated persons who desired to visit the premises for the
purpose of engaging in the employment of the plaintiff, and for
the purpose of trading with the plaintiff; that they had wilfully
and maliciously intimidated and threatened the persons whom he
had employed to take their places with bodily harm if they
continued in the plaintiff's employment, and had caused certain
new men so employed to leave his employment, that they had
notified the insurance companies that the property there insured
was in danger, and had attempted to effect a cancellation of the
insurance carried by the plaintiff on his stock of goods; that they
had followed the delivery team of the plaintiff in divers places
and cities, and had been to several customers of the plaintiff

and threatened to injure them and their business if they continued to trade with the plaintiff, and generally to injure the plaintiff in his said business, and to prevent his continuing to carry on his business; that the defendants, their agents and servants, had been and were a nuisance and obstruction to persons travelling on the street, and to persons in the employ of the plaintiff, and to persons intending to trade with the plaintiff at his premises; that all acts of the defendants were a part of a scheme to prevent persons from entering the employment of the plaintiff and from continuing in his employment, that the business carried on by the plaintiff was a large one, and the good will was of considerable value, in both of which the plaintiff had already been injured; and that, if the defendants were permitted to continue their acts, both the business and the good will would be further seriously injured and destroyed.

The prayer of the bill was that the defendants might be restrained from visiting, or causing other persons to visit, the premises occupied by the plaintiff, or from stopping or remaining in the vicinity of the premises for the purpose of interfering with the workmen of the plaintiff or any person who might desire to enter his employment, or by intimidation, insults, or threats from inducing any person in the employment of the plaintiff to leave, or any person to refrain from entering into, such employment, and from any and all acts within or in the immediate vicinity of the plaintiff's premises which would tend to obstruct him in the transaction of his business therein, or intimidate or annoy the workmen of the plaintiff as they enter into or depart from the premises, and from annoying and intimidating persons who might desire to work therein; and for further relief.

The following decree was entered at a preliminary hearing upon the bill: "This cause came on to be heard upon the plaintiff's motion for a temporary injunction; and after due hearing, at which the several defendants were represented by counsel, it is ordered, adjudged, and decreed that an injunction issue *pendente lite*, to remain in force until the further order of this court, or of some justice thereof, restraining the respondents and each and every of them, their agents and servants, from interfering with the plaintiff's business by patrolling the

sidewalk or street in front or in the vicinity of the premises occupied by him, for the purpose of preventing any person or persons who now are or may hereafter be in his employment, or desirous of entering the same, from entering it, or continuing in it; or by obstructing or interfering with such persons, or any others, in entering or leaving the plaintiff's said premises; or by intimidating, by threats or otherwise, any person or persons who now are or may hereafter be in the employment of the plaintiff, or desirous of entering the same, from entering it, or continuing in it; or by any scheme or conspiracy among themselves or with others, organized for the purpose of annoying, hindering, interfering with, or preventing any person or persons who now are or may hereafter be in the employment of the plaintiff, or desirous of entering the same, from entering it, or from continuing therein."

Hearing upon the bill and answers before *Holmes*, J., who reported the case for the consideration of the full court, as follows:

"The facts admitted or proved are that, following upon a strike of the plaintiff's workmen, the defendants have conspired to prevent the plaintiff from getting workmen, and thereby to prevent him from carrying on his business unless and until he will adopt a schedule of prices which has been exhibited to him, and for the purpose of compelling him to accede to that schedule, but for no other purpose. If he adopts that schedule he will not be interfered with further. The means adopted for preventing the plaintiff from getting workmen are, (1) in the first place, persuasion and social pressure. And these means are sufficient to affect the plaintiff disadvantageously, although it does not appear, if that be material, that they are sufficient to crush him. I ruled that the employment of these means for the said purpose was lawful, and for that reason refused an injunction against the employment of them. If the ruling was wrong, I find that an injunction ought to be granted.

"(2) I find also, that, as a further means for accomplishing the desired end, threats of personal injury or unlawful harm were conveyed to persons seeking employment or employed, although no actual violence was used beyond a technical battery, and although the threats were a good deal disguised, and express words were avoided. It appeared to me that there was

danger of similar acts in the future. I ruled that conduct of this kind should be enjoined.

"The defendants established a patrol of two men in front of the plaintiff's factory, as one of the instrumentalities of their plan. The patrol was changed every hour, and continued from half-past six in the morning until half-past five in the afternoon, on one of the busy streets of Boston. The number of men was greater at times, and at times showed some little inclination to stop the plaintiff's door, which was not serious, but seemed to me proper to be enjoined. The patrol proper at times went further than simple advice, not obtruded beyond the point where the other person was willing to listen, and conduct of that sort is covered by (2) above, but its main purpose was in aid of the plan held lawful in (1) above. I was satisfied that there was probability of the patrol being continued if not enjoined. I ruled that the patrol, so far as it confined itself to persuasion and giving notice of the strike, was not unlawful, and limited the injunction accordingly.

"There was some evidence of persuasion to break existing contracts. I ruled that this was unlawful, and should be enjoined.

"I made the final decree appended hereto. If, on the foregoing facts, it ought to be reversed or modified, such · decree is to be entered as the full court may think proper; otherwise, the decree is to stand."

The final decree was as follows: "This cause came on to be heard, and was argued by counsel; and thereupon, on consideration thereof, it is ordered, adjudged, and decreed that the defendants, and each and every of them, their agents and servants, be restrained and enjoined from interfering with the plaintiff's business by obstructing or physically interfering with any persons in entering or leaving the plaintiff's premises numbered 141, 143, 145, 147 North Street in said Boston, or by intimidating, by threats, express or implied, of violence or physical harm to body or property, any person or persons who now are or hereafter may be in the employment of the plaintiff, or desirous of entering the same, from entering or continuing in it, or by in any way hindering, interfering with, or preventing any person or persons who now are in the employment of the plaintiff from continuing therein, so long as they may be bound so to do by lawful contract."

The case was argued at the bar in March, 1896, and afterwards was submitted on briefs to all the judges.

*T. H. Russell*, for the defendants.

*E. B. Hale*, for the plaintiff.

ALLEN, J.    The principal question in this case is whether the defendants should be enjoined against maintaining the patrol.    The report shows that, following upon a strike of the plaintiff's workmen, the defendants conspired to prevent him from getting workmen, and thereby to prevent him from carrying on his business, unless and until he should adopt a certain schedule of prices.    The means adopted were persuasion and social pressure, threats of personal injury or unlawful harm conveyed to persons employed or seeking employment, and a patrol of two men in front of the plaintiff's factory, maintained from half past six in the morning till half past five in the afternoon, on one of the busiest streets of Boston.    The number of men was greater at times, and at times showed some little disposition to stop the plaintiff's door.    The patrol proper at times went further than simple advice, not obtruded beyond the point where the other person was willing to listen ; and it was found that the patrol would probably be continued, if not enjoined. There was also some evidence of persuasion to break existing contracts.

The patrol was maintained as one of the means of carrying out the defendants' plan, and it was used in combination with social pressure, threats of personal injury or unlawful harm, and persuasion to break existing contracts.    It was thus one means of intimidation indirectly to the plaintiff, and directly to persons actually employed, or seeking to be employed, by the plaintiff, and of rendering such employment unpleasant or intolerable to such persons.    Such an act is an unlawful interference with the rights both of employer and of employed.    An employer has a right to engage all persons who are willing to work for him, at such prices as may be mutually agreed upon ; and persons employed or seeking employment have a corresponding right to enter into or remain in the employment of any person or corporation willing to employ them.    These rights are secured by the Constitution itself.    *Commonwealth* v. *Perry*, 155 Mass. 117.    *People* v. *Gillson*, 109 N. Y. 389.    *Braceville Coal Co.* v.

*People*, 147 Ill. 66, 71. *Ritchie* v. *People*, 155 Ill. 98. *Low* v. *Rees Printing Co.* 41 Neb. 127. No one can lawfully interfere by force or intimidation to prevent employers or persons employed or wishing to be employed from the exercise of these rights. In Massachusetts, as in some other States, it is even made a criminal offence for one by intimidation or force to prevent or seek to prevent a person from entering into or continuing in the employment of a person or corporation. Pub. Sts. c. 74, § 2. Intimidation is not limited to threats of violence or of physical injury to person or property. It has a. broader signification, and there also may be a moral intimidation which is illegal. Patrolling or picketing, under the circumstances stated in the report, has elements of intimidation like those which were found to exist in *Sherry* v. *Perkins*, 147 Mass. 212. It was declared to be unlawful in *Regina* v. *Druitt*, 10 Cox C. C. 592; *Regina* v. *Hibbert*, 13 Cox C. C. 82; and *Regina* v. *Bauld*, 13 Cox C. C. 282. It was assumed to be unlawful in *Trollope* v. *London Building Trades Federation*, 11 T. L. R. 228, though in that case the pickets were withdrawn before the bringing of the bill. The patrol was an unlawful interference both with the plaintiff and with the workmen, within the principle of many cases, and, when instituted for the purpose of interfering with his business, it became a private nuisance. See *Carew* v. *Rutherford*, 106 Mass. 1; *Walker* v. *Cronin*, 107 Mass. 555; *Barr* v. *Essex Trades Council*, 8 Dick. 101; *Murdock* v. *Walker*, 152 Penn. St. 595; *Wick China Co.* v. *Brown*, 164 Penn. St. 449; *Cœur d'Alene Consolidated & Mining Co.* v. *Miners' Union*, 51 Fed. Rep. 260; *Temperton* v. *Russell*, [1893] 1 Q. B. 715; *Flood* v. *Jackson*, 11 T. L. R. 276; *Wright* v. *Hennessey*, a case before Baron Pollock, 52 Alb. L. J. 104; *Judge* v. *Bennett*, 36 W. R. 103; *Lyons* v. *Wilkins*, [1896] 1 Ch. 811.

. The defendants contend that these acts were justifiable, because they were only seeking to secure better wages for themselves by compelling the plaintiff to accept their schedule of wages. This motive or purpose does not justify maintaining a patrol in front of the plaintiff's premises, as a means of carrying out their conspiracy. A combination among persons merely to regulate their own conduct is within allowable competition, and is lawful, although others may be indirectly affected thereby.

But a combination to do injurious acts expressly directed to another, by way of intimidation or constraint, either of himself or of persons employed or seeking to be employed by him, is outside of allowable competition, and is unlawful. Various decided cases fall within the former class, for example : *Worthington* v. *Waring*, 157 Mass. 421; *Snow* v. *Wheeler*, 113 Mass. 179; *Bowen* v. *Matheson*, 14 Allen, 499; *Commonwealth* v. *Hunt*, 4 Met. 111; *Heywood* v. *Tillson*, 75 Maine, 225; *Cote* v. *Murphy*, 159 Penn. St. 420; *Bohn Manuf. Co.* v. *Hollis*, 54 Minn. 223; *Mogul Steamship Co.* v. *McGregor*, [1892] A. C. 25; *Curran* v. *Treleaven*, [1891] 2 Q. B. 545, 561. The present case falls within the latter class.

Nor does the fact that the defendants' acts might subject them to an indictment prevent a court of equity from issuing an injunction. It is true that ordinarily a court of equity will decline to issue an injunction to restrain the commission of a crime; but a continuing injury to property or business may be enjoined, although it may also be punishable as a nuisance or other crime. *Sherry* v. *Perkins*, 147 Mass. 212. *In re Debs*, 158 U. S. 564, 593, 599. *Baltimore & Potomac Railroad* v. *Fifth Baptist Church*, 108 U. S. 317, 329. *Cranford* v. *Tyrrell*, 128 N. Y. 341, 344. *Gilbert* v. *Mickle*, 4 Sandf. Ch. 357. *Mobile* v. *Louisville & Nashville Railroad*, 84 Ala. 115, 126. *Arthur* v. *Oakes*, 63 Fed. Rep. 310. *Toledo, Ann Arbor, & North Michigan Railway* v. *Pennsylvania Co.* 54 Fed. Rep. 730, 744. *Emperor of Austria* v. *Day*, 3 DeG., F. & J. 217, 239, 240, 253. *Hermann Loog* v. *Bean*, 26 Ch. D. 306, 314, 316, 317. *Monson* v. *Tussaud*, [1894] 1 Q. B. 671, 689, 690, 698.

A question is also presented whether the court should enjoin such interference with persons in the employment of the plaintiff who are not bound by contract to remain with him, or with persons who are not under any existing contract, but who are seeking or intending to enter into his employment. A conspiracy to interfere with the plaintiff's business by means of threats and intimidation, and by maintaining a patrol in front of his premises in order to prevent persons from entering his employment, or in order to prevent persons who are in his employment from continuing therein, is unlawful, even though such persons are not bound by contract to enter into or to con-

tinue in his employment; and the injunction should not be so limited as to relate only to persons who are bound by existing contracts. *Walker* v. *Cronin*, 107 Mass. 555, 565. *Carew* v. *Rutherford*, 106 Mass. 1. *Sherry* v. *Perkins*, 147 Mass. 212. *Temperton* v. *Russell*, [1893] 1 Q. B. 715, 728, 731. *Flood* v. *Jackson*, 11 L. T. R. 276.

In the opinion of a majority of the court the injunction hould be in the form originally issued.          *So ordered.*

FIELD, C. J.  The practice of issuing injunctions in cases of this kind is of very recent origin.  One of the earliest authorities in the United States for enjoining in equity acts somewhat like those alleged against the defendants in the present case is *Sherry* v. *Perkins*, 147 Mass. 212, decided in 1888.  It was found as a fact, in that case, that the defendants entered into a scheme by threats and intimidation to prevent persons in the employment of the plaintiffs as lasters from continuing in such employment, and in like manner to prevent other persons from entering into such employment as lasters; that the use of the banners was a part of the scheme; that the first banner was carried from January 8, 1887, to March 22, 1887, and the second banner from March 22, 1887, to the time of the hearing; and that the plaintiffs were injured in their business and property thereby.  The full court say : " The act of displaying banners with devices, as a means of threats and intimidation to prevent persons from entering into or continuing in the employment of the plaintiffs, was injurious to the plaintiffs, and illegal at common law and by statute.  Pub. Sts. c. 74, § 2.  *Walker* v. *Cronin*, 107 Mass. 555. . . . The banner was a standing menace to all who were or wished to be in the employment of the plaintiffs, to deter them from entering the plaintiffs' premises.  Maintaining it was a continuous unlawful act, injurious to the plaintiffs' business and property, and was a nuisance such as a court of equity will grant relief against.  *Gilbert* v. *Mickle*, 4 Sandf. Ch. 357.  *Springhead Spinning Co.* v. *Riley*, L. R. 6 Eq. 551."

Of the authorities cited in *Sherry* v. *Perkins*, *Gilbert* v. *Mickle* was a suit in equity by an auctioneer against the mayor of the city of New York, to restrain him and those acting under

him from parading, placing, or keeping before the plaintiff's auction rooms a placard as follows: "Strangers, beware of mock auctions." A temporary injunction was issued, but on hearing it was dissolved. Notwithstanding what is said in the opinion of the Vice Chancellor, his conclusion is as follows: "I am satisfied that it is my duty to leave the party to his remedy by an action at law." *Springhead Spinning Co.* v. *Riley* is a well known decision of Vice Chancellor Malins. The bill prayed that the defendants might be "restrained from printing or publishing any placards or advertisements similar to those already set forth." The defendants had caused to be posted on the walls and other public places in the neighborhood of the plaintiff's works, and caused to be printed in certain newspapers, a notice as follows: "Wanted all well-wishers to the Operative Cotton Spinners, &c. Association, not to trouble or cause any annoyance to the Springhead Spinning Company, Lees, by knocking at the door of their office until the dispute between them and the self-actor minders is finally terminated. By special order. Carrodus, 32, Greaves Street, Oldham." The case was heard upon demurrers. The Vice Chancellor says: "For the reasons I have stated, I overrule these demurrers, because the bill states, and the demurrers admit, acts amounting to the destruction of property." Of that case the court, in *Sherry* v. *Perkins,* say: "Some of the language in *Springhead Spinning Co.* v. *Riley* has been criticised, but the decision has not been overruled." The cases are there cited in which that decision has been doubted or criticised. Of the decision this court, in *Boston Diatite Co.* v. *Florence Manuf. Co.* 114 Mass. 69, say: "The opinions of Vice Chancellor Malins in *Springhead Spinning Co.* v. *Riley,* L. R. 6 Eq. 551, in *Dixon* v. *Holden,* L. R. 7 Eq. 488, and in *Rollins* v. *Hinks,* L. R. 13 Eq. 355, appear to us to be so inconsistent with these authorities [authorities which the court had cited] and with well settled principles, that it would be superfluous to consider whether, upon the facts before him, his decisions can be supported." Much the same language was used by the justices in *Prudential Assurance Co.* v. *Knott,* L. R. 10 Ch. 142, a part of the head-note of which is "*Dixon* v. *Holden* and *Springhead Spinning Company* v. *Riley* overruled." In *Temperton* v. *Russell,* [1893] 1 Q. B. 435, 438, Lindley, L. J.,

says of the case of *Springhead Spinning Co.* v. *Riley*, that it was overruled by the Court of Appeal in *Prudential Assurance Co.* v. *Knott.*

Since the Judicature Act, however, the courts of England have interfered to restrain by injunction the publication or continued publication of libellous statements, particularly those injuriously affecting the business or property of another, as well as injunctions similar to that in the present case. St. 36 & 37 Vict. c. 66, § 25, subsect. 8. *Monson* v. *Tussaud*, [1894] 1 Q. B. 671, 692. *Lyons* v. *Wilkins*, [1896] 1 Ch. 811, 827. But in the absence of any power given by statute, the jurisdiction of a court of equity having only the powers of the English High Court of Chancery, does not, I think, extend to enjoining acts like those complained of in the case at bar, unless they amount to a destruction or threatened destruction of property, or an irreparable injury to it.

In England, the rights of employers and employed, with reference to strikes, boycotts, and other similar movements, have not in general been left to be worked out by the courts from common law principles, but statutes from time to time have been passed defining what may and what may not be permitted. The administration of these statutes largely has been through the criminal courts.

As a means of prevention, the remedy given by Pub. Sts. c. 74, § 2, would seem to be adequate where the section is applicable, unless the destruction of or an irreparable injury to property is threatened, and there is the additional remedy of an indictment for a criminal conspiracy at common law if the acts of the defendants amount to that. If the acts complained of do not amount to intimidation or force, it is not in all respects clear what are lawful and what are not lawful at common law. It seems to be established in this Commonwealth, that intentionally and without justifiable cause to entice by persuasion a workman to break an existing contract with his employer, and to leave his employment, is actionable, whether done with actual malice or not. *Walker* v. *Cronin*, 107 Mass. 555. What constitutes justifiable cause remains in some respects undetermined. Whether to persuade a person who is free to choose his employment not to enter into the employment of another person gives

a cause of action to such other person, by some courts has been said to depend upon the question of actual malice, and in considering this question of malice it is said that it is important to determine whether the defendant has any lawful interest of his own in preventing the employment, such as that of competition in business. For myself, I have been unable to see that malice is necessarily decisive. I am not convinced that to persuade one man not to enter into the employment of another, by telling the truth to him about such other person and his business, is actionable at common law, whatever the motive may be.

Such persuasion, when accompanied by falsehood about such other person or his business, may be actionable, unless the occasion of making the statements is privileged, and then the question of actual malice may be important. This, I think, is the effect of the decision in *Rice* v. *Albee*, 164 Mass. 88. When one man orally advises another not to enter into a third person's employment, it would, I think, be a dangerous principle to leave his liability to be determined by a jury upon the question of his malice or want of malice, except in those cases where the words spoken were false. In the present case, if the establishment of a patrol is using intimidation or force within the meaning of our statutes, it is illegal and criminal ; if it does not amount to intimidation or force, but is carried to such a degree as to interfere with the use by the plaintiff of his property, it may be illegal and actionable, but something more is necessary to justify issuing an injunction ; if it is in violation of any ordinance of the city regulating the use of streets, there may be a prosecution for that, and the police can enforce the ordinance : but if it is merely a peaceful mode of finding out the persons who intend to go to the plaintiff's premises to apply for work, and of informing them of the actual facts of the case in order to induce them not to enter into the plaintiff's employment, in the absence of any statute relating to the subject I doubt if it is illegal, and I see no ground for issuing an injunction against it.

As no objection is now made by the defendants to the equitable jurisdiction, I am of opinion, on the facts reported, as I understand them, that the decree entered by Mr. Justice Holmes should be affirmed without modification.

HOLMES, J.   In a case like the present, it seems to me that, whatever the true result may be, it will be of advantage to sound thinking to have the less popular view of the law stated, and therefore, although when I have been unable to bring my brethren to share my convictions my almost invariable practice is to defer to them in silence, I depart from that practice in this case, notwithstanding my unwillingness to do so in support of an already rendered judgment of my own.

In the first place, a word or two should be said as to the meaning of the report.   I assume that my brethren construe it as I meant it to be construed, and that, if they were not prepared to do so, they would give an opportunity to the defendants to have it amended in accordance with what I state my meaning to be.   There was no proof of any threat or danger of a patrol exceeding two men, and as of course an injunction is not granted except with reference to what there is reason to expect in its absence, the question on that point is whether a patrol of two men should be enjoined.   Again, the defendants are enjoined by the final decree from intimidating by threats, express or implied, of physical harm to body or property, any person who may be desirous of entering into the employment of the plaintiff so far as to prevent him from entering the same.   In order to test the correctness of the refusal to go further, it must be assumed that the defendants obey the express prohibition of the decree.   If they do not, they fall within the injunction as it now stands, and are liable to summary punishment.   The important difference between the preliminary and the final injunction is that the former goes further, and forbids the defendants to interfere with the plaintiff's business " by any scheme . . . organized for the purpose of . . . preventing any person or persons who now are or may hereafter be . . . desirous of entering the [plaintiff's employment] from entering it."   I quote only a part, and the part which seems to me most objectionable.   This includes refusal of social intercourse, and even organized persuasion or argument, although free from any threat of violence, either express or implied.   And this is with reference to persons who have a legal right to contract or not to contract with the plaintiff, as they may see fit.   Interference with existing contracts is forbidden by the final decree.   I wish to insist a

little that the only point of difference which involves a differ-
ence of principle between the final decree and the preliminary
injunction which it is proposed to restore, is what I have men-
tioned, in order that it may be seen exactly what we are to
discuss.    It appears to me that the judgment of the majority
turns in part on the assumption that the patrol necessarily
carries with it a threat of bodily harm.    That assumption I
think unwarranted, for the reasons which I have given.    Further-
more, it cannot be said, I think, that two men walking together
up and down a sidewalk and speaking to those who enter a
certain shop do necessarily and always thereby convey a threat
of force.    I do not think it possible to discriminate, and to say
that two workmen, or even two representatives of an organiza-
tion of workmen, do, — especially when they are, and are known
to be, under the injunction of this court not to do so.    See
Stimson, Handbook to Labor Law, § 60, esp. pp. 290, 298, 299,
300; *Regina* v. *Shepherd*, 11 Cox C. C. 325.    I may add, that I
think the more intelligent workingmen believe as fully as I do
that they no more can be permitted to usurp the State's pre-
rogative of force than can their opponents in their controversies.
But if I am wrong, then the decree as it stands reaches the
patrol, since it applies to all threats of force.    With this I pass
to the real difference between the interlocutory and the final
decree.

I agree, whatever may be the law in the case of a single
defendant, *Rice* v. *Albee*, 164 Mass. 88, that when a plaintiff
proves that several persons have combined and conspired to
injure his business, and have done acts producing that effect, he
shows temporal damage and a cause of action, unless the facts
disclose, or the defendants prove, some ground of excuse or jus-
tification.    And I take it to be settled, and rightly settled, that
doing that damage by combined persuasion is actionable, as
well as doing it by falsehood or by force.    *Walker* v. *Cronin*,
107 Mass. 555.    *Morasse* v. *Brochu*, 151 Mass. 567.    *Tasker* v.
*Stanley*, 153 Mass. 148.

Nevertheless, in numberless instances the law warrants the
intentional infliction of temporal damage because it regards it as
justified.    It is on the question of what shall amount to a justi-
fication, and more especially on the nature of the considerations

which really determine or ought to determine the answer to that question, that judicial reasoning seems to me often to be inadequate. The true grounds of decision are considerations of policy and of social advantage, and it is vain to suppose that solutions can be attained merely by logic and the general propositions of law which nobody disputes. Propositions as to public policy rarely are unanimously accepted, and still more rarely, if ever, are capable of unanswerable proof. They require a special training to enable any one even to form an intelligent opinion about them. In the early stages of law, at least, they generally are acted on rather as inarticulate instincts than as definite ideas for which a rational defence is ready.

To illustrate what I have said in the last paragraph, it has been the law for centuries that a man may set up a business in a country town too small to support more than one, although he expects and intends thereby to ruin some one already there, and succeeds in his intent. In such a case he is not held to act "unlawfully and without justifiable cause," as was alleged in *Walker* v. *Cronin* and *Rice* v. *Albee.* The reason, of course, is that the doctrine generally has been accepted that free competition is worth more to society than it costs, and that on this ground the infliction of the damage is privileged. *Commonwealth* v. *Hunt*, 4 Met. 111, 134. Yet even this proposition nowadays is disputed by a considerable body of persons, including many whose intelligence is not to be denied, little as we may agree with them.

I have chosen this illustration partly with reference to what I have to say next. It shows without the need of further authority that the policy of allowing free competition justifies the intentional inflicting of temporal damage, including the damage of interference with a man's business, by some means, when the damage is done not for its own sake, but as an instrumentality in reaching the end of victory in the battle of trade. In such a case it cannot matter whether the plaintiff is the only rival of the defendant, and so is aimed at specifically, or is one of a class all of whom are hit. The only debatable ground is the nature of the means by which such damage may be inflicted. We all agree that it cannot be done by force or threats of force. We all agree, I presume, that it may be done by persuasion to leave

a rival's shop and come to the defendant's. It may be done by the refusal or withdrawal of various pecuniary advantages which, apart from this consequence, are within the defendant's lawful control. It may be done by the withdrawal, or threat to withdraw, such advantages from third persons who have a right to deal or not to deal with the plaintiff, as a means of inducing them not to deal with him either as customers or servants. *Commonwealth* v. *Hunt*, 4 Met. 111, 132, 133. *Bowen* v. *Matheson*, 14 Allen, 499. *Heywood* v. *Tillson*, 75 Maine, 225. *Mogul. Steamship Co.* v. *McGregor*, [1892] A. C. 25.

I pause here to remark that the word " threats " often is used as if, when it appeared that threats had been made, it appeared that unlawful conduct had begun. But it depends on what you threaten. As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do, that is, give warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences. So as to " compulsion," it depends on how you " compel." *Commonwealth* v. *Hunt*, 4 Met. 111, 133. So as to " annoyance " or " intimidation." *Connor* v. *Kent, Curran* v. *Treleaven*, 17 Cox C. C. 354, 367, 368, 370. In *Sherry* v. *Perkins*, 147 Mass. 212, it was found as a fact that the display of banners which was enjoined was part of a scheme to prevent workmen from entering or remaining in the plaintiff's employment, " by threats and intimidation." The context showed that the words as there used meant threats of personal violence, and intimidation by causing fear of it.

I have seen the suggestion made that the conflict between employers and employed is not competition. But I venture to assume that none of my brethren would rely on that suggestion. If the policy on which our law is founded is too narrowly expressed in the term free competition, we may substitute free struggle for life. Certainly the policy is not limited to struggles between persons of the same class competing for the same end. It applies to all conflicts of temporal interests.

So far, I suppose, we are agreed. But there is a notion which latterly has been insisted on a good deal, that a combination of persons to do what any one of them lawfully might do by himself will make the otherwise lawful conduct unlawful. It would

be rash to say that some as yet unformulated truth may not be hidden under this proposition. But in the general form in which it has been presented and accepted by many courts, I think it plainly untrue, both on authority and on principle. *Commonwealth* v. *Hunt*, 4 Met. 111. *Randall* v. *Hazelton*, 12 Allen, 412, 414. There was combination of the most flagrant and dominant kind in *Bowen* v. *Matheson* and in the Mogul Steamship Company's case, and combination was essential to the success achieved. But it is not necessary to cite cases; it is plain from the slightest consideration of practical affairs, or the most superficial reading of industrial history, that free competition means combination, and that the organization of the world, now going on so fast, means an ever increasing might and scope of combination. It seems to me futile to set our faces against this tendency. Whether beneficial on the whole, as I think it, or detrimental, it is inevitable, unless the fundamental axioms of society, and even the fundamental conditions of life, are to be changed.

One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of capital, to get his services for the least possible return. Combination on the one side is patent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way. I am unable to reconcile *Temperton* v. *Russell*, [1893] 1 Q. B. 715, and the cases which follow it, with the Mogul Steamship Company case. But *Temperton* v. *Russell* is not a binding authority here, and therefore I do not think it necessary to discuss it.

If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that when combined they have the same liberty that combined capital has to support their interests by argument, persuasion, and the bestowal or refusal of those advantages which they otherwise lawfully control. I can remember when many people thought that, apart from violence or breach of contract, strikes were wicked, as organized refusals to work. I suppose that intelligent economists

and legislators have given up that notion to-day. I feel pretty confident that they equally will abandon the idea that an organized refusal by workmen of social intercourse with a man who shall enter their antagonist's employ is wrong, if it is dissociated from any threat of violence, and is made for the sole object of prevailing if possible in a contest with their employer about the rate of wages. The fact, that the immediate object of the act by which the benefit to themselves is to be gained is to injure their antagonist, does not necessarily make it unlawful, any more than when a great house lowers the price of certain goods for the purpose, and with the effect, of driving a smaller antagonist from the business. Indeed, the question seems to me to have been decided as long ago as 1842 by the good sense of Chief Justice Shaw, in *Commonwealth* v. *Hunt,* 4 Met. 111. I repeat at the end, as I said at the beginning, that this is the point of difference in principle, and the only one, between the interlocutory and the final decree. See *Regina* v. *Shepherd,* 11 Cox C. C. 325 ; *Connor* v. *Kent, Gibson* v. *Lawson, Curran* v. *Treleaven,* 17 Cox C. C. 354.

The general question of the propriety of dealing with this kind of case by injunction I say nothing about, because I understand that the defendants have no objection to the final decree if it goes no further, and that both parties wish a decision upon the matters which I have discussed.