INDIANA STATE FAIR BOARD, ESTEL CALLAHAN AS SECRETARY-MANAGER INDIANA STATE FAIR BOARD *v.* THE HOCKEY CORPORATION OF AMERICA, THE WINTER CLUB OF INDIANAPOLIS, INC., AMICUS CURIAE, DON JO CORPORATION, D/B/A KILLBUCK VALLEY SPORTS, AMICUS CURIAE.

[No. 2-1273A269. Filed August 28, 1975. Rehearing denied September 22, 1975.]

*Theodore L. Sendak,* Attorney General, *J. Gordon Gibbs, Jr.,* Deputy Attorney General, for appellant.

*Dean E. Richards,* of Indianapolis, for appellee Hockey Corporation, *William M. Osborn, Bingham Summers Welsh & Spilman,* of Indianapolis, for appellee Winter Club, *John Eisele,* of Anderson, for appellee Killbuck Valley Sports.

SULLIVAN, P.J.—Appellee, Hockey Corporation of America (Hockey), commenced this action on May 22, 1973 in the Marion County Superior Court seeking injunctive relief and damages. From a judgment in favor of Hockey Corporation, the appellant, Indiana State Fair Board (Fair Board) appeals.

The operative facts, as viewed most favorably to the trial court's judgment, establish the following:

The Fair Board is a governmental instrumentality statutorily denominated as "the sole agency of the State of Indiana to administer said trust property [the State Fairgrounds] for and on behalf of the State of Indiana."[1] Since 1964, Fair Board has operated a public ice skating rink and a retail and rental skate shop at the Coliseum on the Fairgrounds. Generally, Fair Board has shown a profit in its skating and shop operation, and, according to appellant Estel L. Callahan, Secretary-Manager of the Fair Board, all revenues are placed in the Fair Board account for maintenance and improvement of the Fairgrounds.[2]

Hockey Corporation is an Indiana for-profit corporation chartered under state law to operate ice skating rinks in the Indianapolis area. Since 1969, it has operated two rinks in Indianapolis. The scope of its corporate activity includes public and private group skating, skating lessons, and retail sales of skates and skating equipment. According to its financial records, Hockey has shown annual net profits from these activities.

---

1. Ind. Ann. Stat. § 15-1-1-1 (Burns Code Ed. 1973).
2. *See* Ind. Ann. Stat. § 15-1-1-23 (Burns Code Ed. 1973).

The gravamen of Hockey Corporation's claim for injunctive relief, as gleaned from the complaint, is that the activities of the Board in operating the rink and shop exceed the powers conferred by the General Assembly; that such activities are ultra vires; and that they deprived Hockey of its due process rights under the Fourteenth Amendment to the United States Constitution in that such activities constituted "unfair competition" by the Board which, by virtue of its preferred tax status, was enabled to conduct such activity in a manner unfair to private corporations engaged in similar activities. Furthermore, Hockey contended that it was directly injured by the Board's activity and sought damages for such injury.

Following a bench trial, the court, on November 30, 1973, ruled that the Fair Board was unfairly competing with Hockey, and was operating outside the scope of the Indiana State Fair Board Act.[3] The court's judgment enjoined the Fair Board's operation of the skating rink and retail skate shop, ordered the Board to take competitive bids for operation of those activities, and awarded Hockey damages in the sum of $19,350.00.

On appeal, Fair Board properly perfected and presents the following contentions for our consideration:

1. The trial court erred in holding that Fair Board is not a corporate entity separate from the State.

2. The court's finding that Fair Board was engaged in "unfair competition" with Hockey is contrary to law and contrary to the evidence; and that the court's finding that the Fair Board's activities were outside the scope of the Act, and therefore ultra vires, is erroneous.

3. The court lacked subject matter jurisdiction due to Fair Board's attempted change of venue.

4. The trial court erred in granting Hockey a temporary restraining order, in extending the temporary order, and in failing to grant Fair Board a hearing on its motion to vacate the order.

3. Ind. Ann. Stat. §§ 15-1-1-1 to -27 (Burns Code Ed. 1973).

I

## STATUS OF STATE FAIR BOARD

Our initial consideration is whether the Fair Board is a separate corporate entity, as the Board contends; or an agency of the State of Indiana, as contended by Hockey.

Ind. Ann. Stat. § 15-1-1-1 (Burns Code Ed. 1973) describes the Fair Board as "the sole agency of the state of Indiana to administer said trust property [State Fairgrounds] for and on behalf of the state of Indiana." This enactment and other provisions of the Indiana State Fair Board Act were surveyed by the Federal District Court in *Chicago Stadium Corp.* v. *State of Indiana* (S. D. Ind. 1954), 123 F. Supp. 783, *modified on other grounds*, 220 F.2d 797 (7th Cir. 1955). The court, applying state law in a diversity contract action, held ". . . that the Indiana State Fair Board is an inseparable agency and not a separate entity of the State of Indiana. . . ." 123 F. Supp. at 790. Interestingly, in the instant case, the Fair Board asserts a position directly contrary to the one it advanced in *Chicago Stadium Corp.* In any event, like the Federal District Court, we find that the Fair Board is an agency of the State of Indiana in the context of this case. *See also Busby* v. *Indiana Bd. of Agriculture* (1927), 85 Ind. App. 572, 154 N.E. 883 (Fair Board predecessor held to be governmental agency).

II

## WHILE THE FAIR BOARD DID NOT ENGAGE IN UNFAIR COMPETITION, ITS OPERATION OF SKATING RINK AND SHOP WAS OUTSIDE BOARD'S STATUTORY AUTHORITY

Fair Board asserts error in the trial court's finding that Fair Board was engaged in "unfair competition" to the detriment of Hockey. Further, the Board argues that Hockey showed no acts of unfair or unlawful competition. Finally, the Board contends that its operation of the skating rink and shop is within the ambit of the State Fair Board Act. Hockey,

on the other hand, asserts the manifest unfairness of a governmental agency, with its attendant and substantial tax base advantages, competing in the private sector. Hockey also contends that the Board's operation of the skating rink and shop is not authorized by the Act and therefore ultra vires.

As a threshold matter, we note that Hockey has the requisite standing to maintain the present suit in its status as both an "injured" competitor and a citizen taxpayer. At common law, a resident taxpayer has had the right to bring an action in equity to contest governmental tax spending policies. *Glosser* v. *City of New Haven* (1971), 256 Ind. 33, 267 N.E.2d 67; *Zoercher* v. *Agler* (1930), 202 Ind. 214, 172 N.E. 186; *Crampton* v. *Zabriskie* (1879), 101 U. S. 601, 25 L. Ed. 1070. Similarly, Hockey's assertion of injury in fact resulting from the Fair Board's competitive conduct is sufficient to confer standing. *Board of Comm's. of County of Howard* v. *Kokomo City Planning Comm.* (1975), 263 Ind. 282, 330 N.E.2d 92. *See also State ex rel. Haberkorn* v. *DeKalb Circuit Court* (1968), 251 Ind. 283, 241 N.E.2d 62; *State* v. *Clark* (1966), 247 Ind. 490, 217 N.E.2d 588.

## A. "UNFAIR COMPETITION"

Historically, the common law tort of "unfair competition" was considered a subspecies of the class of torts known as tortious interference with business or contractual relations. Prosser, *Law of Torts*, § 130 (4th ed. 1971). The court, in *Jones* v. *Roshenberger, Admr.* (1924), 82 Ind. App. 97, 99-100, 144 N.E. 858, defined it as follows:

"Unfair competition consists in passing off or attempting to pass off upon the public, * * * the goods or business of another. It consists essentially in the conduct of a trade or business in such a manner that there is either an express or implied representation to that effect. And it may be stated broadly that any conduct, the natural and probable tendency and effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another, constitutes unfair competition. The definition is comprehensive enough to reach every possible means of effecting the result."

*See also Minas Furniture Co.* v. *Edward C. Minas Co.* (1929), 96 Ind. App. 520, 165 N.E. 84; *Deister Concentrator Co.* v. *Deister Machine Co.* (1916), 63 Ind. App. 412, 112 N.E. 906; *Hartzler* v. *The Goshen Churn and Ladder Co.* (1914), 55 Ind. App. 455, 104 N.E. 34.

Somewhat more broadly, Dean Prosser defined "unfair competition" in the following manner:

> "Though trade warfare may be waged ruthlessly to the bitter end, there are certain rules of combat which must be observed. 'The trader has not a free lance. Fight he may, but as a soldier, not as a guerrilla.' In the interests of the public and the competitors themselves, boundaries have been set by the law, and numerous practices have been marked out as 'unfair' competition, for which, in general, a tort action will lie in favor of the injured competitor, although very often the tort is given some other name.

> \* \* \*

> "Included in the list are defamation of the competitor, disparagement of his goods and his business methods, intimidation, harassing and annoyance of his customers or his employees, obstruction of the means of access to his place of business, threats of groundless suits, commercial bribery, and inducing employees to commit sabotage." Prosser, *Law of Torts,* § 130, p. 956 (4th ed. 1971). *See also* Restatement, Torts, §§ 709, 710.

Neither Hockey's complaint nor the trial court's judgment are predicated upon any recognized form of *tortious* interference with business relations. Furthermore, in the instant case, it is readily apparent that a claim for damages resulting from any presumable tortious conduct by Fair Board has not been established. The evidence establishes that Fair Board conducted the rink and shop operations for five years prior to Hockey's incorporation. It also appears that the Fair Board has not materially altered its manner of operation for the purpose of driving Hockey out of the market or to injure Hockey's competitive position. Rather, the evidence adduced at trial merely establishes the normal and somewhat profitable conduct of a skating rink and shop by Fair Board. As cogently stated by Dean Prosser:

"The policy of the common law has always been in favor of free competition, which proverbially is the life of trade. So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means. Any other rule would tend to the recognition of trade monopolies.

\* \* \*

"In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.

\* \* \*

"The privilege of competition is limited to bona fide competition. It does not extend to situations where the defendant is not seeking to acquire the business diverted from the plaintiff for himself, but to gratify ill will or further some unrelated interest. Thus it does not extend to cases where there is no genuine competitive interest, but competition is simulated for spiteful ends or ulterior purposes, as where the defendant sets up a rival barber shop or engages in predatory price cutting, not to make profits for himself but to drive the plaintiff out of business. Even the fact that he expects to derive an ultimate economic benefit from the elimination of the plaintiff is not regarded as a sufficient justification in such cases since indirect methods of this kind are not considered legitimate in the pursuit of profits." Id. at 954-56.

See also *Karges Furniture Co.* v. *Amalgamated Woodworkers' Local Union No. 131* (1905), 165 Ind. 421, 75 N.E. 877; *Jackson* v. *Stanfield* (1894), 137 Ind. 592, 396 N.E. 345.

In any event, we shall not read the trial court's judgment narrowly, but, instead, must look to the evidence of Fair Board's activities in an effort to find any conduct supportive of the judgment for damages. The trial court predicated the award of damages on the competitive advantage afforded Fair

Board by its exemption from taxation[4] and its revenue base of tax monies.[5] However, neither party has directed our attention to any authority with respect to a governmental agency's ability or inability to compete in the private commercial sector.

In *Beard* v. *Board of Education of North Summit School District* (1932), 81 Utah 51, 16 P.2d 900, the plaintiff, an operator of an opera house, brought suit as a citizen taxpayer and a competitor, against the local school board for allegedly impermissible uses of a school auditorium. In denying plaintiff's claim of damages sustained by unfair competition, the court held:

> "It is contended by plaintiff that to use a tax-exempt, tax-supported institution to compete with a taxpayer is manifestly unfair and constitutes unfair competition. If the use made of the school building and grounds is lawful, it matters not that such use is competitive with plaintiff's opera house, or that plaintiff's income has been impaired by such competitive use. When free public schools were first established, they competed with and ultimately drove from the field numerous private schools, but those who conducted the private schools could not complain of unfair competition since the state had the right to establish the free school system. Universities and colleges established by the states are in direct competition with privately controlled colleges, but the competition is not unfair nor unlawful because the state has the power to establish its universities and colleges, and to support them by taxation. Municipal water works and electric lighting plants may compete with those privately owned, but the competition is neither unfair nor unlawful where the municipal plants are established and operated pursuant to lawful authority. [Citations omitted] The intent of a party to draw custom from a competitor is not actionable unless his acts are unlawful. [Citations omitted]

> \* \* \*

> "Plaintiff has no constitutional or other legal right to enjoy a monopoly in his line of business because he may have been first in the field. Undoubtedly the revenues from the use of his opera house are affected adversely by the use of the school building for entertainments and activities, some of

---

4. *See* Ind. Ann. Stat. § 15-1-1-8 (Burns Code Ed. 1973).
5. Ind. Ann. Stat. § 15-1-1-14 (Burns Code Ed. 1973).

which might, but for such use of the school building, be held in his opera house. He has no legal right to complain merely because of the competition. If his competitor had been a person or corporation which by reason of owning a more commodious and sanitary hall or one more centrally located had attracted business away from his opera house he would have no ground for legal action. Neither can there be ground for complaint here if the schoolhouse is being used in a manner and for a purpose authorized by law. Any right which he may have to question the power of the board of education and to enjoin such board from the exercise of powers beyond its jurisdiction is sufficiently asserted in the first cause of action wherein plaintiff sues as a taxpaying citizen of the district." 16 P.2d at 902.

Similarly, in *Petition of City of Detroit* (1954), 339 Mich. 62, 62 N.W.2d 626, plaintiffs, owners and operators of privately-owned automobile parking lots, sought to enjoin the city, with its attendant tax base advantages, from entering into competition with plaintiffs by acquiring and operating off-street parking facilities. The court, quoting from *Andrews v. City of South Haven* (1915), 187 Mich. 294, 153 N.W. 827, stated:

" 'In the exercise of proprietary and business powers of a municipal corporation, it is governed by the same rules which control a private individual or a business corporation: in such case the fact that a city engaging in a commercial line of activity competes with and damages one of its inhabitants in his trade or business does not entitle him to relief against municipal action for the city owes him no immunity from competition.' " 62 N.W.2d at 630.

Simply stated, a private corporation operating under a general charter from the state and without benefit of some particular protective or regulatory authority of law has no legally recognizable right to freedom from lawful competition. *Hulbert* v. *Mybeck* (1942), 220 Ind. 530, 44 N.E.2d 830; *Farmers and Merchants' Co-operative Telephone Co.* v. *Boswell Telephone Co.* (1918), 187 Ind. 371, 119 N.E. 513; *Karges Furniture Co.* v. *Amalgamated Woodworker's Local Union No. 131, supra; Hardin* v. *Kentucky Utilities Co.* (1968), 390 U. S. 1, 88 S. Ct. 651; *Railroad Co.* v. *Ellerman* (1881), 105 U.S. 166, 26 L. Ed. 1015. Injury occasioned by

lawful[6] competition is *damnum absque injuria* and is not actionable. *Karges Furniture Co.* v. *Amalgamated Woodworker's Local Union No. 131, supra; Alabania Power Co.* v. *Ickes* (1938), 302 U.S. 464, 58 S. Ct. 300. A governmental agency may, in the absence of some prohibitory statutory or constitutional provision, engage in lawful competition with private concerns. *See Petition of City of Detroit, supra; Westbrook* v. *Univ. of Ga. Ath. Assn. Inc.* (1950), 206 Ga. 667, 58 S.E.2d 428; *Villyard* v. *Regents of Univ. System of Georgia* (1948), 204 Ga. 517, 50 S.E.2d 313; *Beard* v. *Bd. of Educ. of North Summit School Dist., supra; Young* v. *Bd. of Trustees of Broadwater County High School* (1931), 90 Mont. 576, 4 P.2d 725; *Keen* v. *Mayor of City of Wayross* (1897), 101 Ga. 588, 29 S.E. 42. *See generally,* Annot. 90 A.L.R.2d 7 (1963).

Hockey contends that Fair Board's operation of the rink and skate shop violates the due process clause of the United States Constitution, U. S. Const. amend. XIV. It has been held that "[c]ompetition may result injuriously, but it is not a taking." *United Railroads* v. *City and County of San Francisco* (N. D. Cal. 1917), 239 F. 987, 997, *aff'd.* 249 U. S. 517, 39 S. Ct. 361. Historically, the law has held the notion of free and open competition in sacrosanct esteem and subject to few subversions.[7] This notion inundates the fundamental socio-economic considerations underlying our form of government. In the event that commercial competi-

---

6. "Lawful", as used herein, denotes competitive acts or conduct not violative of any constitutional, statutory or common law rights. Conversely, "unlawful" denotes acts or conduct specifically prohibited by a constitutional or statutory provision and should be viewed in juxtaposition to unauthorized or ultra vires acts. Essentially, ultra vires acts, as discussed in subsection B, infra, are acts or conduct of a governmental agency not within the scope of its enabling statute, but also not specifically prohibited by such statute. *See Leeds* v. *City of Richmond* (1885), 102 Ind. 372, 1 N.E. 711; *Cummins* v. *Seymour* (1881), 79 Ind. 491; *Bajdek* v. *Bd. of Trustees of the American Legion Pulaski Post No. 357 Trust* (1961), 132 Ind. App. 116, 173 N.E.2d 61. *See generally* 18 McQuillin, *Municipal Corporations,* § 53.60, pp. 282-86 (1963); 7 Fletcher *Corporations,* §§ 3399, 3400, pp. 563-69 (1964).

7. *See, e.g., Gibbons* v. *Ogden* (1824), 9 Wheat. 1, 22 U.S. 1; *Vegelahn* v. *Guntner* (1896), 167 Mass. 92, 106, 44 N.E. 1077 (Holmes, J., dissenting); *see also* Jones, *Historical Development of the Law of Business Competition,* 35 YALE L.J. 905, 36 YALE L.J. 42, 207, 351 (1926-1927); Note, *Competition and the Law,* 15 HARV. L. Rev. 427 (1902).

tion from government be deemed undesirable, redress is obtainable from other branches of government which may properly give voice to and implement such public policy.

For the foregoing reasons, the trial court's judgment, insofar as it awarded damages to Hockey, is in error, and is hereby reversed.

## B.  "ULTRA VIRES"

In rendering judgment, the trial court permanently enjoined Fair Board's direct operation of the rink and skate shop.  The court further ordered Fair Board to take competitive bids on the operation of the rink and shop, and, if no bids were received, the Fair Board, upon authority of the court, could then conduct the rink and shop activities.  In this regard, even though its judgment provided for contingent direct operation of the facility, the trial court reasoned in part that the State Fair Board Act permitted the Fair Board to expand its scope of activities only in the furtherance of agriculture and, since the operation of the rink and shop do not relate to agriculture, the conduct of the Board was ultra vires.  Conversely, the Board contends that its operation of the rink and shop is within the discretionary powers permitted by the Act.

In order to determine whether an agency is operating beyond the permissible scope of its authority, we must utilize the traditional methodology of statutory interpretation. Section 15-1-1-7 specifies the powers of the Fair Board, and provides:

"Powers of board:  To hold fairs—Receive contributions—Control of grounds and buildings—Collection of rentals and fees—Restrictions on use of grounds and buildings—Enlargement of the scope of activities.—The Indiana state fair board shall have power to hold state fairs at such times and places as it may deem proper and expedient and have the entire control of the same, fixing the amounts of various premiums offered embracing the various products of farm, field, garden, animal husbandry, or other industries relating to agriculture, including any article of science and art as it may deem expedient and proper.  Said board is authorized to receive contributions and donations which may be made for the furtherance of its purposes.  Said board shall also

have complete control of said state fair grounds, the buildings and other equipment thereon and all property and property rights held for furtherance of its purposes, and it is authorized to purchase, exchange and sell such other real property, equipment, and material, proceeds from which shall be deposited in the accounts of the state fair board, and erect such other buildings or make improvements thereof, as may by it be deemed necessary to the proper control of the exhibitions held under its direction and to rent buildings or space therein, or space on said grounds for exhibitions during fairs and for such other purposes at other times as the board may determine; to fix and collect rentals for the same, to fix and collect entrance fees, admission fees, and privilege fees, as may be deemed just and proper: Provided, however, That the board shall not permit any use of the grounds or buildings in a manner prohibited by the laws of the state of Indiana; nor shall any obscene shows, fakirs, fortune tellers, or games of chance be allowed on the grounds. The board shall have power to enlarge the scope and field of its activities from time to time as it may deem to the advantage of agriculture, including district fairs, and its kindred pursuits: Provided further, That the sale, exchange, or purchase of real property shall be made only after approval of the same by the governor; and Provided further, That the authority granted herein to exchange and sell real property shall not apply to that property or any part thereof, known as the Indiana state fairgrounds, upon which the Indiana state fair is held, which was conveyed by the Indiana state board of agriculture to the State of Indiana by warranty deed executed and delivered to the governor of said state on May 31, 1921."

As gleaned from this section, the Board is given "complete control" over the fair grounds, including the ability to lease the grounds and buildings thereon when the fair is not in session. More importantly, the legislature reposed authority in the Board "to enlarge the scope and field of its activities from time to time as it may deem to the advantage of agriculture, including district fairs, and its kindred pursuits. . . ." A fundamental tenet of statutory construction is that words and phrases, as used in a statute, must be given their ordinary, commonsensical meaning. *Overlade* v. *Wells* (1955), 234 Ind. 436, 127 N.E.2d 686. This Court, in *Fleckles* v. *Hille* (1925), 83 Ind. App. 715, 149 N.E. 915, defined the term "agriculture" as:

". . . the art or science of cultivating the soil, including the planting of seed, the harvesting of crops, and the raising, feeding and management of live stock or poultry." 149 N.E. at 915.

Clearly, the operation of an ice skating rink and a retail and rental skate shop is not within the recognized definition of agriculture.

However, the argument is advanced by the Fair Board that implicit authority to conduct such activities *"in the furtherance* of agriculture" is bestowed on the Board by Section 15-1-1-22 which provides:

"Charges for cost of operation and administration expenses. —The board shall be authorized to fix, review, charge and collect fees, rentals and other charges for the use of the project, buildings, facilities and lands under the jurisdiction or control of the board, or services rendered by the board, and the aggregate thereof shall provide revenues at least sufficient to pay the cost of the operation of the state fair and the operation, maintenance and repair of the state fair grounds, including the administration expenses of the board, and in case revenue bonds are issued, sufficient to pay the interest on and principal of the bonds in accordance with their terms, and also sufficient to establish and maintain reserves created for all such purposes and for depreciation purposes. The fixing and collection of such fees, rental and other charges and the expenditure of the revenues derived therefrom shall not be subject to the supervision or regulation by any other officer, commission, board, bureau or agency of the state."

Fair Board interprets this provision as authorizing—indeed, mandating, the operation of profitable commercial ventures for the support and maintenance of the fair grounds.

The paramount principle in the proper construction of a legislative enactment is to ascertain the legislative will, implicitly or explicitly expressed, in the enactment as a whole, *Schulz* v. *Graham* (1955), 234 Ind. 243, 126 N.E.2d 1; and to harmonize, if possible, words and phrases of a particular section with other sections of the statute, *Indiana State Highway Comm.* v. *White* (1973), 259 Ind. 690, 291 N.E.2d 550. In the instant case, Section 15-1-1-12 is dispositive of the legislative intent, and provides:

"Property to be held in trust by state—Uses and purposes.—All property acquired by the state of Indiana from the Indiana state board of agriculture by deed duly executed pursuant to the provisions of chapter 77 and 122 of the Acts of the General Assembly of 1921, with any additions to such property which has been or may hereafter be acquired by the state as incident to the management of such property, shall be held by the state in trust for the uses and purposes as defined in the deed of conveyance from said Indiana state board of agriculture, *it being the legislative intent that said property be held by the state as trustee for the interest of agriculture and allied industries* as expressed in the said instrument of conveyance." (emphasis supplied.)

In the face of such patently expressed purpose, this Court holds that the Fair Board's direct operation of the skating rink and shop is outside the scope of the Act.

Finally, the Board contends that the legislature, by its inaction in promulgating prohibitory enactments regarding the skating and retail shop activities, has acquiesced in the conduct of such activities. A definitive statement of the doctrine of legislative acquiescence was advanced by this Court in *King* v. *Harris* (1965), 140 Ind. App. 9, 212 N.E.2d 387, 392, wherein it was held that:

"[a]dherence to administrative and judicial interpretations of legislative enactments without subsequent legislative action dealing specifically with the subject matter so interpreted raises the presumption of legislative acquiescence in said interpretations."

In the instant case, however, the doctrine is inapplicable. First, legislative inaction regarding a particular subject creates only a presumption of legislative intent; and, while the presumption is entitled to considerable weight, this court is not bound to such an administrative interpretation if incorrect, or if the legislative will is manifest. *Baker* v. *Compton* (1965), 247 Ind. 39, 211 N.E.2d 162. Secondly, the doctrine's rationale seeks to ensure consistency and stability in the reliance previously placed on such interpretation by parties. *Baker* v. *Compton, supra.* In the case at bar, the legislative intent as expressed in Section 15-1-1-12 is patent, and we

know of no previous instances of reliance by any party placed upon the Board's interpretation of its own powers with respect to the conduct of the questioned activities.

### III
### FAIR BOARD'S CHANGE OF VENUE, ALTHOUGH PROPERLY PERFECTED, WAS WAIVED BY INACTION

Fair Board vigorously asserts that its properly perfected change of venue divested the trial court of subject matter jurisdiction, and that all subsequent actions by the trial court are void.

The record on appeal reveals that a motion for change of venue was filed by Fair Board on June 21, 1973. Both parties timely struck counties and Hancock County was selected for venue. On July 2, 1973, the Marion County trial court, pursuant to Hockey's motion, vacated the change of venue, reassumed jurisdiction, and set the case for trial. The court on September 27, again ordered the change of venue vacated due to a previous scrivener's error committed by the parties in specifying the appropriate cause number. Thereafter, Hockey presented its case-in-chief on October 12. On November 8, Fair Board, following issuance of the temporary restraining order discussed in Part IV, *infra,* made a motion to transfer the cause to Hancock County prior to presenting its case.

The gravamen of Fair Board's appellate argumentation is that since the State need not pay the costs of a venue change, *State* v. *City of Terre Haute* (1968), 250 Ind. 613, 238 N.E.2d 459, its change of venue was perfected upon the selection of Hancock County. While we agree with this general proposition of law, it does not necessarily follow that the trial court committed error in striking the change of venue and reasoning jurisdiction.

We are persuaded by the following considerations. First, a change of venue affects the trial court's jurisdiction over the particular case, not its subject matter jurisdiction, *State ex rel. City of Indianapolis v. Superior Court of Marion County* (1955), 235 Ind. 151, 128 N.E.2d

874; and the complete divestiture of jurisdiction occurs when the transcript and necessary filings are received in the clerk's office of the venue court, Ind. Rules of Procedure, Trial Rule 78; *Smith* v. *Indiana State Board of Health* (1973), 158 Ind. App. 445, 303 N.E.2d 50, *cert. den.* 419 U. S. 836. Prior to the complete divestiture of jurisdiction, a moving party may waive its right to a venue change; for example, by failure to promptly strike a county, *State ex rel City of Indianapolis* v. *Superior Court of Marion County, supra;* or by failure to object to venue in an improper county, *Newton* v. *Bd. of Trustees of Vincennes University* (1968), 142 Ind. App. 391, 235 N.E.2d 84. Moreover, Ind. Rules of Procedure, Trial Rule 76(7) states that a party waives the right to a change of venue "if a cause is set for trial before the expiration of the date within which a party may ask for a change . . . and no objection is made thereto. . . ." *See State ex rel. Meeks* v. *Porter Superior Court* (1968), 250 Ind. 416, 234 N.E.2d 848. The concept of waiver is not unknown to the right of venue change, *State ex rel. City of Indianapolis* v. *Superior Court of Marion County, supra;* and we hold that where, as in the case at bar, a moving party, following a perfected change of venue, proceeds to trial in the original county the movant cannot thereafter complain and seek to transfer the cause to the venue county. The liberal objectives of our venue rules, *see State ex rel. City of Indianapolis* v. *Superior Court of Marion County, supra; Grothe* v. *Herschbach* (1972), 153 Ind. App. 224, 286 N.E.2d 868; do not countenance a party's ability to have venue in two counties simultaneously, and the manifest unfairness of such a result is readily apparent in this case where the objection to the court's resumption of jurisdiction was made after the non-moving party (Hockey) had presented its case.

## IV

## ERROR, IF ANY, IN GRANTING AND CONTINUING TEMPORARY RESTRAINING ORDER IS HARMLESS

Following the presentation of its case, Hockey, on October 12, 1973, filed a motion for a temporary restraining order.

On the same day, the trial court granted the restraining order and set the bond at $1000. On October 16, Fair Board filed a petition to vacate and dissolve the restraining order. Thereafter, on October 22, the trial court increased the bond to $50,000, and granted Fair Board an additional ten (10) days to present evidence supportive of its petition to vacate and dissolve the order. Fair Board also filed an additional motion to dissolve and vacate the restraining order. From the record before us, it appears that no further entries or filings were made regarding the restraining order, and Fair Board presented its case on November 8. On appeal, Fair Board contests the granting, and subsequent extension, of the restraining order without a hearing.

We find no error in the trial court's action for two reasons. First, the granting or dissolution of temporary restraining orders is committed to the sound discretion of the trial court, and, absent an abuse of discretion, the court on appeal will not disturb the restraining order. *Indiana Annual Conf. Corp.* v. *Lemon* (1956), 235 Ind. 163, 131 N.E.2d 780; *Spicer* v. *Hoop* (1875), 51 Ind. 365; *School City of Gary* v. *Continental Electric Co.* (1971), 149 Ind. App. 416, 273 N.E.2d 293.

Secondly, any error occasioned by the trial court's action is harmless. This court, in a not dissimilar case, *Wallace* v. *Simpson* (1940), 108 Ind. App. 54, 27 N.E.2d 130, construed Burns Indiana Statutes § 3-2104 (1933 Revision),[8] a statutory precursor of Ind. Rules of Procedure, Trial Rule 65(B), and held:

> "The appellants contend that under this statute the court was without jurisdiction to grant a temporary injunction until after notice had issued and an opportunity for hearing had been granted. Conceding for the purposes of this case that a temporary restraining order was the proper practice,

---

8. "No injunction shall be granted until it shall appear to the court or judge granting it that some one or more of the opposite parties concerned has had reasonable notice of the time and place of making the application, except that in cases of emergency, to be shown in the complaint, the court may grant a restraining order until notice can be given and hearing thereon."

yet it does not follow that the action of the court in issuing the order that was made in this case constitutes reversible error.

Since no appeal was taken from this order as entered until after a hearing was had upon the merits and a permanent injunction was ordered, *such permanent injunction vacates the temporary order and the error in issuing the same, if any, has become harmless. Price* v. *Bayless,* 1892, 131 Ind. 437, 31 N.E. 88." 27 N.E.2d at 132. (Emphasis supplied.)

Thus, even if issuance and extension of the restraining order be viewed as if it were a temporary injunction, the failure of a hearing does not warrant reversal.

For the above stated reasons, the trial court's judgment is affirmed only insofar as it enjoins the Fair Board's direct operation of the skating rink and the retail and rental skate shop. In all other respects, the trial court's judgment is reversed.

Buchanan and White, JJ., concur.

NOTE.—Reported at 333 N.E.2d 104.