**INDIANA GROCERY CO., INC., and Preston–Safeway, Inc., Plaintiffs,**

**v.**

**SUPER VALU STORES, INC., d/b/a Cub Foods, Markkay of Indiana, Inc., d/b/a Cub Foods, and the Kroger Company, Defendants.**

**No. IP 85–176–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 26, 1988.

Robert P. Johnstone, Barnes & Thornburg, Indianapolis, Ind., for Indiana Grocery Co., Inc.

David M. Mattingly, Ice Miller Donadio & Ryan, John C. Stark, Stark Doninger Mernitz & Smith, Indianapolis, Ind., for Preston–Safeway, Inc.

Samuel A. Fuller, Lewis Kappes Fuller & Eads, Indianapolis, Ind., Mark J. Spooner, Arnold & Porter, Washington, D.C., for The Kroger Co.

Judith Kirtland, Lewis Bowman St. Clair & Wagner, Indianapolis, Ind., James E. Wesner, Ginsburg Feldman & Bress, Washington, D.C., for Super Valu Stores.

Joe C. Emerson, Baker & Daniels, Indianapolis, Ind., N. Reed Silliman, Baker & Daniels & Shoaff, Fort Wayne, Ind., for Markkay of Indiana.

McKINNEY, District Judge.

Plaintiff Indiana Grocery filed its complaint against defendants Super Valu Stores, Inc., d/b/a Cub Foods, Markkay of Indiana, Inc., d/b/a Cub Foods, and The Kroger Company on February 4, 1985. Plaintiffs, Indiana Grocery, Inc., and Preston–Safeway, Inc., filed an amended seven count complaint against the same defendants on January 30, 1986. This cause is before the Court on a motion for summary judgment filed by Kroger addressed to Counts I, II and III, and on motions for summary judgment by Super Valu and Markkay addressed to Counts II through VII. Also pending before the Court are a motion to dismiss filed by Kroger on Counts II and III, and motions to dismiss filed by Super Valu and Markkay on Counts II, III, VI, and VII. The motions to dismiss will not be discussed since the Court's disposition of the motions for summary judgment will render these motions to dismiss moot.

Paragraph I of plaintiffs' complaint alleges that both Kroger and Super Valu attempted to create a monopoly in the Indianapolis, Indiana, retail grocery market in violation of § 2 of the Sherman Antitrust Act found at 15 U.S.C. § 1 *et. seq.* The plaintiffs having dismissed its § 2 claim against Super Valu now proceed in Paragraph I only as against Kroger. The Court will set out its findings of fact and then proceed to deal with issues paragraph by paragraph of the complaint.

### FINDINGS OF FACT

1. During the period at issue in this litigation, Kroger faced competition in the Indianapolis area from a large corporation (Super Valu Stores, Inc.), which had both the intent and the resources to remain in Indianapolis as a significant competitor.

2. Given Super Valu's size and resources, Kroger could not reasonably have expected that it would be able to drive the Cub stores out of the Indianapolis area.

3. Kroger thought it could force Super Valu to "re-think" its plans in Indianapolis and elsewhere through its aggressive response to Cub Foods' entry into Indianapolis. Kroger hoped that Super Valu would introduce subsequent Cub stores in Indianapolis on a smaller, less aggressive scale. More recently, Kroger planned to "co-exist" with Cub at "acceptable profit levels".

4. During the period at issue in this litigation, Kroger did not have the power to control the supply of groceries to consumers in the Indianapolis Metropolitan Statistical Area ("MSA") or in any part thereof.

5. During the period at issue in this litigation, Kroger did not have the power, in the Indianapolis MSA or any of the alleged "submarkets" defined by plaintiffs, to control market prices for any products typically sold in retail grocery stores.

6. During the period at issue in this litigation, there was not a dangerous probability that Kroger would acquire the power to control the supply of groceries to consumers in the Indianapolis MSA or in any part thereof.

7. During the period at issue in this litigation, there was not a dangerous probability that Kroger would acquire the power, in the Indianapolis MSA or any of the alleged "submarkets" defined by plaintiffs, to control market prices for any products typically sold in retail grocery stores.

8. At the time Super Valu entered the Indianapolis market in August 1983, Kroger operated 32 grocery stores in the Indianapolis MSA. Kroger's competitors included the following companies, who operated approximately the following numbers of stores: Marsh Supermarkets, Inc.—29 stores; Preston–Safeway, Inc.—15 stores; Indiana Grocery ("Standard", "Super Standard" and "No Frills")—29 stores; The Great Atlantic & Pacific Tea Co. ("A & P")—11 stores; O'Malia Food Markets, Inc. —6 stores; Dietel's, Inc. ("Mr. D's")—4 stores; Aldi, Inc.,—4 stores; and Seven–Eleven Supermarkets, Inc.—4 stores. There were at least 40 additional full-line grocery stores operated by others in the Indianapolis metropolitan area and numerous small markets such as convenience stores.

9. The "numerous small markets and convenience stores" are not in the relevant product market as defined by plaintiffs' experts.

10. Commencing in 1983, Super Valu opened four Cub stores in Indianapolis. The first, located on Lafayette Road on the west side of Indianapolis, began operating Labor Day weekend of 1983. The second, which was on East Washington Street on the east side of Indianapolis, opened in December 1983. The third, in Greenwood, opened in July 1984, and the fourth, located in the Castleton area on the north side of Indianapolis, opened in May 1986.

11. In the spring of 1984, plaintiff Indiana Grocery acquired six retail grocery stores from plaintiff Preston–Safeway.

After that transaction, Preston–Safeway had six remaining stores.

12. In 1985, the owners of Indiana Grocery acquired all of the capital stock of Preston–Safeway. Since that time, the two corporations have been affiliated companies. Commencing in early 1986, Indiana Grocery converted all of its stores in the Indianapolis MSA to the "Preston–Safeway" name.

13. As of September 1987, Kroger had 33 stores in the Indianapolis MSA. Kroger's multi-store competitors include the following companies, who operate approximately the following numbers of stores: Marsh—30; Indiana Grocery/Preston–Safeway—24; Cub—4; O'Malia—9; Mr. D's—5; Aldi—5; Seven–Eleven—4. There are approximately 38 additional full-line grocery stores operated by others in the Indianapolis area, as well as numerous smaller retailers such as convenience stores.

14. The entry of Cub stores into Indianapolis in 1983 engendered intense price competition among retail grocery firms. Retail price levels were reduced from the levels that had previously existed in the market.

15. After the entry of the Cub stores, retail price levels gradually increased somewhat from the lowest levels that prevailed in the months immediately after the entry of those stores. Nevertheless, retail price levels have remained lower than they were before Cub's entry.

16. The pricing of Kroger complained of by plaintiff has ended.

17. Kroger's retail prices were never at a level at which the company's revenues in the Indianapolis MSA as a whole failed to cover its variable costs in the MSA.

18. In the alleged north "submarket" that plaintiffs have defined, Kroger's revenues never fell below its variable costs.

19. According to plaintiffs' expert, Kroger's revenues exceeded its variable costs in the alleged south, east and west "submarkets" during all accounting periods except for the following: south—2 periods; east—3 periods; west—5 periods.

20. Super Valu is a public company which operates primarily as a wholesale grocer.

21. Super Valu also owns and operates a limited number of retail grocery stores in various parts of the United States.

22. One of Super Valu's retail operations is the Cub Foods division.

23. Super Valu acquired Cub Foods from the Hooley family in 1980.

24. Super Valu has subsequently expanded operations of corporately-owned and franchised Cub Foods stores into other states.

25. Markkay was formed in 1983.

26. Markkay owns and operates a Cub Foods franchise in Indianapolis.

27. Markkay's principals are George McKay and Donald Murphy, both of whom are retired former executives of Super Valu.

28. Markkay's store, which is located across the street from Lafayette Square Shopping Center, was opened on August 31, 1983.

29. A corporately-owned Cub Foods store, located at the Eastgate Shopping Center, was opened in December 1983.

30. A corporately-owned Cub Foods store, located in the Greenwood area, was opened in July 1984.

31. A franchise Cub Foods store, located in the Castleton area, was opened in May 1985.

32. Under the Cub Foods franchise program, a franchisee acquires from Super Valu the right to use the "Cub Foods" name.

33. Under the Cub Foods franchise program, a franchisee is provided a site screening and development service, a preopening training program for certain of the franchisee's employees and subsequent access to management advice and other forms of technical assistance.

34. All Cub Foods franchisees execute an Affiliates Agreement, which establishes the basic terms of the franchise.

35. All Cub Foods franchisees also enter into a Policy Agreement, which outlines the basic features of the Cub Foods' marketing concept.

36. Franchisees may also enter into an Umbrella Agreement.

37. Under the Umbrella Agreement, Super Valu provides additional supervisory and marketing services, the right to participate with other area Cub Foods stores in a joint advertising program, assistance in coordinating the franchisee's scanner pricing program, and advice concerning the optimum levels at which the more than 10,000 items in a Cub Foods store should be priced.

38. The Umbrella Agreement expressly states that the pricing service to be provided by Super Valu will be to recommend prices.

39. Markkay entered into an Umbrella Agreement with Super Valu.

40. The Cub Foods price lists are stored in computer programs maintained by Super Valu at its Minneapolis, Minnesota, headquarters and its Ft. Wayne, Indiana, warehouse.

41. The information on the Cub Foods price lists for the local and regional markets where stores are located is kept current by Super Valu employees in the regional offices, who review changes in the cost of items to be sold by the stores and assign to the items new retail prices to reflect such changes.

42. These cost changes, together with other changes to reflect special promotions or desired responses to local competitors' prices, are transmitted electronically to the central computer system where they are entered in the system and transmitted back to the regional offices as revised price lists.

43. The information on the Cub Foods price lists is then printed out in hard copy in a price book.

44. The prices in the price book are checked by the local store's pricing coordinator to assure that the store's posted shelf prices conform with the revised price book, after which they are ready to be transferred onto the store's cash register

scanning system for use at checkout counters.

45. At a corporately-owned Cub Foods store, prices that are entered on the basic price lists are automatically used unless the store manager requests, and the regional merchandiser approves, a different price.

46. At a franchisee Cub Foods store, price changes that originate with the regional merchandising manager need not be accepted and may be rejected by declining to transfer the changes onto the store's cash register scanning system.

47. In late 1983, Super Valu granted Markkay a $500,000 credit against sums it owed to the Ft. Wayne warehouse after it became apparent that Markkay's losses had nearly exhausted the initial working capital that had been earmarked to carry the company through its first 12 months of operations.

48. In 1984, the Ft. Wayne warehouse discovered an accounting error which had produced a build-up of approximately $450,-000 in Markkay's accounts receivable.

49. Markkay was allowed to pay back this amount in installments of $12,500 per month, without interest.

## MEMORANDUM OF LAW

For its attempted monopoly claim plaintiffs allege that defendant Cub Foods entered the Indianapolis retail grocery market in September 1983. Cub Foods is a super warehouse store [1] owned by defendant Super Valu. Plaintiffs complain that the aggressive response of Kroger, a supermarket,[2] to the entrance of Cub Foods into the Indianapolis retail grocery market was in fact Kroger attempting to monopolize the Indianapolis grocery market. Plaintiffs allege that Kroger's response to Cub Foods' entry was to sell its groceries for a substantial period of time for less than its average variable costs. Plaintiffs allege that this pricing strategy amounts to predatory pricing and that it has resulted in substantial and intentionally incurred losses to Kroger. Plaintiffs allege that these predatory pricing practices in the Indianapolis market and Kroger's willingness to incur these substantial losses are part of Kroger's strategy to drive other competition from the relevant market so that Kroger can raise its prices in the future to abnormally high levels which will permit Kroger to recoup its losses.

Plaintiffs go on to allege that the retail grocery market in Indianapolis is inelastic in consumer demand. They urge that price increases or decreases do not greatly affect the total amount of groceries sold in any market or submarket. Plaintiffs claim that because Kroger sold at such low prices in response to Cub's entry in the market place Kroger raised a substantial barrier to new entries into the market further injuring competition. That is, no one will want to enter the Indianapolis grocery market if they are to be subjected to the substantial below average variable cost pricing of which Kroger has allegedly shown itself capable. Plaintiffs complain that if Kroger's pricing had continued unabated plaintiffs and other independent competitors would have been driven out of business in the Indianapolis market and Kroger would have attained monopoly status able to charge monopoly prices.

Further, plaintiffs specifically complain that as a result of Kroger's present and potential market power, its financial resources, its intent to monopolize the Indianapolis market, its pricing policies, the inelasticity of demand in the market, and deterrents to market entry caused by Kroger's pricing policies, there is and has been a dangerous probability that Kroger would succeed in its perceived attempt to eliminate competitors and obtain the power to control prices in the Indianapolis retail grocery market. This conduct, plaintiffs claim, amounts to a violation of § 2 of the Sherman Act, as an attempted monopoly.

Plaintiffs have survived a motion to dismiss on these allegations of a § 2 violation.

1. As defined in Amended Statement on Opinions of Bruce W. Marion [plaintiffs' expert] filed June 15, 1987, p. 9.

2. As defined in Amended Statement of Opinions of Bruce W. Marion filed June 15, 1987, p. 3.

*Indiana Grocery Co., Inc. v. Super Valu Stores, Inc.,* 647 F.Supp. 254 (S.D.Ind. 1986). The issue of whether plaintiffs alleged the proper matters has been put to rest. The question now is whether the plaintiffs can survive a motion for summary judgment.

Plaintiffs' complaint involves concepts of market share, market power, market definition, market deterrents, monopoly power, monopoly pricing, predatory pricing, and competition. These are not easily definable concepts nor does their interface with a given set of facts admit to facile process. The stage upon which all of these terms play a part is sometimes lighted by the penumbra cast by the caution that "we must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986) quoting *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 234 (1st Cir.1983). Unsanctioned tampering with free market pricing by monopolists can damage competition and ultimately the consumer. Separation of injury to competitors from injury to competition and ultimately consumers can be as difficult as it is crucial.

■ The very elements of an attempted monopoly case reflect the concern of the courts over the tension between the competing economic benefits of market control and market freedom. Those elements are "(1) specific intent to control prices or destroy competition with respect to a part of commerce, (2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success." *Chillicothe Sand and Gravel v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir.1980) quoting *Gough v. Rossmoor Corp.,* 585 F.2d 381, 390 (9th Cir.1978). The case of *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255 (7th Cir.1981), added a further clarification to the third element: "a dangerous probability of success in the relevant market which requires evidence that the defendant had sufficient market power to have been reasonably able to create a monopoly." *Id.* at 270 (citations omitted).

As each of these elements has been discussed post *Chillicothe,* lower courts have been cautioned to carefully evaluate the theories on each element and to observe the interrelationships of the three elements. The Ninth Circuit, unlike the Seventh, considers the elements so closely related that they are willing to infer a dangerous probability of success from intent and conduct in some circumstances. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981).

■ Addressing the requirement of intent to monopolize, Judge Easterbrook, in *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325 (7th Cir.1986) reminds us what intent does *not* mean: " 'intent to harm rivals' is not a useful standard in antitrust." Id. at 1338. Judge Easterbrook further quotes from *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232 (1st Cir.1983): "[I]ntent to harm [rivals] without more offers too vague a standard in a world where executives may think no further than 'Let's get more business' and long term effects on consumers depend in large measure on competitors' responses." Further, Judge Easterbrook states "Neither is 'intent to do more business', which amounts to the same thing. Vigorous competitors intend to harm rivals, to do all the business they can. To penalize this intent is to penalize competition." *Ball Memorial,* 784 F.2d at 1338–39. Judge Easterbrook does not decide what culpable intent means. He decides what it does not mean. Culpable intent in a § 2 attempted monopoly antitrust law does not mean intent to do more business, to increase market shares or to harm rivals. *See also Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532 (7th Cir. 1986) and *MCI Communications Corp. v. American Telephone and Telegraph Co.,* 708 F.2d 1081 (7th Cir.1983).

Having pointed out that competition and not competitors is the protected entity under § 2, Judge Easterbrook in *Ball Memo-*

*rial, supra,* acknowledges that the distinction is not as easy as it sounds:

> "Sometimes injury to rival firms can be a precursor to injury to the consumers; after knocking rivals out of the market, a firm may curtail output and raise prices. Section 2 may be used to prevent this conduct. Yet it must be used with the greatest caution. Action that injures rivals *may* ultimately injure consumers, but it is also perfectly consistent with competition, and to deter aggressive conduct is to deter competition. Thus the plaintiff faces a stiff burden in any § 2 litigation." 784 F.2d at 1338 (emphasis in original.)

Plaintiffs in the instant case face a stiff burden. They must show more than the intent to injure competitors. They must show the intent to subsequently injure consumers by the raising of prices to monopoly levels, the second portion of the two-fold definition of monopoly. The culpable intent must include the intent to injure consumers with prices unrestrained by competitive forces.

*Lektro–Vend, supra,* elaborated on the intent issue stating that element number one was "a specific intent to monopolize, i.e., to gain the power to control prices or to exclude competition in a line of commerce." 660 F.2d at 270. Further, Judge Pell, speaking for the court, pointed out the relationship of the specific intent requirement and the second requirement of predatory conduct to accomplish the monopoly end. At page 272, Judge Pell acknowledges, "While specific intent to monopolize can sometimes be inferred from predatory acts, the plaintiffs have failed to show that Vendo's actions relating to Stoner were not primarily motivated by legitimate business purposes." A monopolizer generally doesn't leave a paper trail, and revelation from an examination of his conduct would of necessity assist in the finding of intent. The predatory acts and the intent deduced therefrom require examination. Were there legitimate business purposes in the actions? Were the actions predatory because of the intent to control prices or exclude competition?

The second requirement of a showing of attempted monopoly is evidence of predatory or anticompetitive conduct directed to accomplishing the unlawful end. Of the kinds of predatory conduct that have been discussed by the courts, plaintiffs herein accuse Kroger of predatory pricing. Again, this is not an easy concept. Judge Easterbrook in his article entitled *Predatory Strategies and Counter Strategies,* 48 U.Chi.L.Rev. 263 (1981) says,

> "There is a highly competitive market for predatory pricing theories. Scholars have produced a blizzard of rules defining unlawful predatory practices. Some of the rules depend on the relationship between price and cost, some on the relationship between price and time, some on the relationship between quantity sold and time. One approach eschews rules altogether and suggests the courts examine the totality of the circumstances. The proponents of cost-based tests do not agree among themselves. Should the rule depend on marginal, average, variable, or average total cost? What is the rule of intent and intent to do what? The most recent approaches propose a collection of cost-based tests; which one applies depends on the structure of the industry and the availability of other strategies that the alleged predator could have pursued." *Id.* at 263–64.

In this quagmire of theories, courts should be cautious of inferences and per se rules based on predatory pricing theories.

Judge Cudahy addressed the principle in *MCI Communications v. American Telephone and Telegraph Co.,* 708 F.2d 1081 (7th Cir.1983):

> "[L]iability for predatory pricing represents an exception to the general antitrust regime which contemplates that no limits on price competition shall be imposed. Predatory pricing is prohibited because of the fear that a monopoly or dominant firm will deliberately sacrifice present revenues for the purpose of driving rivals from the market and then recoup its losses through higher profits earned in the absence of competition." *Id.* at 1112.

The gravamen of predation is not the recoupment of losses from increased market sales at competitive prices, it is the recoupment of losses from monopoly prices. Predatory pricing is pricing by a monopoly or at least a dominant firm that will cause that firm to suffer losses, the purpose for which is to allow the predator to recoup losses through higher prices set in the no longer competitive market. This again is the concept that distinguishes anti-competitor conduct from anticompetitive conduct. Predation is a two-fold notion: prey and recoup at higher prices than a competitive market would permit.

Justice Powell in *Matsushita, supra,* quotes Professor Bork, for this notion of predation:

> "Any realistic theory of predation recognizes that the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in the future undisturbed profits (where rivals are to be disciplined). The future flow of profits appropriately discounted must then exceed the present size of the losses." *Matsushita,* 475 U.S. at 589, 106 S.Ct. at 1357, quoting R. Bork, *The Antitrust Paradox* 145 (1978).

Again, there is nothing predatory about recouping from increased market sales or competitive prices.

This concept of predation is extremely important in the § 2 scheme. If a predatory act itself will support an inference of intent as Judge Pell suggests in *Vendo, supra,* then the predatory behavior must be examined closely.

Note that while the predatory conduct is two-fold as explained above, the predatory intent is also two-fold: To prey and to recoup. As Justice Powell further points out in *Matsushita,* "The success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." 475 U.S. at 589, 106 S.Ct. at 1357. The loss to be recouped is more than the dollar amount of the loss suffered.

Having examined the first two thresholds of an attempted monopoly case, it is clear that by itself a showing of specific intent to control prices and destroy competitors is insufficient to make the case. Predatory behavior must also be shown. Applied to the instant case, the requisite intent to monopolize can be found in defendants' pricing below cost only if appended thereto is the goal of recouping losses and more in a competitor free market. *Matsushita; MCI, supra.*

Areeda and Turner are cited continually in antitrust matters. In Volume III of their work on antitrust, *An Analysis of Antitrust Principles And Their Application* (1978) Areeda and Turner make the following contribution to the theory of predation:

> "Indeed, the classically feared case of predation has been the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition. Thus, predatory pricing would make little economic sense to a potential predator unless he had (1) greater staying power than his rivals, and (2) a very substantial prospect that the losses he incurs in the predatory campaign will be exceeded by the profits to be earned after his rivals have been destroyed ...[It] should, of course, be recognized that predation cannot be successful and therefore is unlikely to occur when the predator's rivals possess resources comparable to his own." 3 P. Areeda & D. Turner, Antitrust Law, ¶ 7116 (1978). (Hereinafter "Areeda & Turner".)

Thus, specifically, pricing is not predatory unless the predator has greater staying power and resources than his rivals. A theory of predation would not be plausible under the above scenario.

It is fair to conclude from the cases and literature on predation that the behavior of an alleged attempted monopolizer requires scrutiny. When the intent to monopolize is sought to be supplied by one of the theo-

ries of predation, the predatory label should not be applied to the behavior under analysis without some view to the staying power of the alleged predator's rivals, some inquiry into the probability of the prospect of the costs of the pricing being recouped, and some examination of the comparable resources of the alleged predator's rivals.

This scrutiny of the second element, predatory behavior, shows its relationship to the third element, substantial probability of success. Did the alleged monopolizer intend to finance his predatory behavior by higher monopoly profits and could he have plausibly done so, had his behavior continued unchecked? Was there a substantial probability of success?

Judge Easterbrook in *Ball Memorial, supra,* quotes from *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which while reflecting on the balancing of interests between regulation and freedom in the market points out the interrelationship between the requisite monopolistic intent and the danger of realizing that intent.

"It is not enough that a single firm appears to 'restrain trade' unreasonably, for even a vigorous competitor may leave that impression. ...In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Copperweld,* 467 U.S. 767–68, 104 S.Ct. 2739–40.

*Hiland Dairy, Inc. v. Kroger Company,* 402 F.2d 968 (8th Cir.1968) addresses the dangerous probability of success criterion. The size of an alleged monopolist's market share and its relationship to the probability of success is discussed.

"While size is an element of monopoly power, a substantial part of the market must be controlled by the monopolist to enable the raising and lowering of prices and the undue restriction on competition.

Of nine cases condemning monopolies under § 2 of the Act the percentage of market share ranges from 70 percent in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 167, 68 S.Ct. 915 [934], 92 L.Ed 1260 (1948) to 100 percent in the [sic] *United States v. Pullman Co.,* [50 F.Supp. 123 (E.D.Pa. (1943)].

These nine cases considered are:

| | Percent Market Share |
|---|---|
| *United States of America v. American Tobacco Company,* 221 U.S. 106, 162, 31 S.Ct. 632 [641], 55 L.Ed. 663 (1911) | 86% |
| *Standard Oil Company of New Jersey v. United States,* 221 U.S. 1, 33, 31 S.Ct. 502 [505], 55 L.Ed. 619 (1911) | 90% |
| *United States v. Eastman Kodak Co.,* 226 F. 62, 79 (W.D.N.Y.1915), appeal dismissed, 255 U.S. 578, 41 S.Ct. 321, 65 L.Ed. 795 | 75–80% |
| *United States v. Pullman Co.,* 50 F.Supp. 123, 135 (E.D.Pa.1943) aff'd per curiam, 330 U.S. 806, 67 S.Ct. 1078, 91 L.Ed. 1263 | 100% |
| *United States v. Aluminum Co. of America,* 148 F.2d 416, 425 (2 Cir. 1945) | 90% |
| *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 167, 68 S.Ct. 915 [934], 92 L.Ed. 1260 (1948) | 70% |
| *United States v. United Shoe Machinery Corp.,* 110 F.Supp 295, 343 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 | 75% |
| *International Boxing Club of New York, Inc. v. United States,* 358 U.S. 242, 249, 79 S.Ct. 245 [249], 3 L.Ed.2d 270 (1959) | 81% |
| *United States v. Grinnell Corp.,* 384 U.S. 563, | |

| | Percent Market Share |
|---|---|
| 567, 86 S.Ct. 1698 [1702], 16 L.Ed.2d 778 (1966) | 87% " |

Id. at 974, and 974 n. 6

Further, the Hiland Dairy Court cites *United States v. United States Steel Corp.*, 251 U.S. 417, 444, 40 S.Ct. 293, 297, 64 L.Ed. 343 (1920) in which the Supreme Court declined to find a monopoly on a market share of 50 percent or less stating "the power attained was much greater than that possessed by any one competitor—it was not greater than that possessed by all of them. Monopoly, therefore, was not achieved." In *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir.1945) the Court found a 90 percent share a monopoly, but said "...it is doubtful whether sixty or sixty-four percent would be enough and certainly 33 percent is not." 148 F.2d at 424.

Areeda and Turner offer the following explanation of the relationship between market share and market power as they relate to a dangerous probability of monopolistic success:

"Perhaps as an aid to predicting dangerous future probability, the cases also require that the defendant possess a measure of present proximity to completed monopoly—a measure of power in a relevant market. As with monopoly, the requisite market position is normally measured through an analysis of market share. Although precise definition of the requisite position is no easier here than in the case of monopoly itself, it is clear that the basic thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share. The defendant need not have present market power, but its position must be sufficiently 'proximate' to monopoly that the challenged conduct threatens success. Moreover, the presumption resting on market share may be overcome on a showing that the market is so narrowly defined, or entry so

free, that 'success' would not yield the *substantial* market power needed for the offense of completed monopolization." 3 Areeda & Turner ¶ 831 (emphasis in original).

Areeda and Turner conclude re attempted monopoly cases:

"We suggest the following rules of thumb, but caution, however, that such refined judgments of conduct and power are very difficult to make and may often be illusory:

(1) Claims involving 30 percent or lower market shares should presumptively be rejected, with the two 'no power' exceptions mentioned above.[3]

(2) In the 30–50 percent range, we would normally reject an attempt claim (with the usual exceptions) [see footnote 3]. We do, however, reserve two categories of conduct—which may or may not exist in a given case—that would justify an attempt finding; (a) conduct which, given the defendant's market share, is very likely, but not quite as certainly as in the first unusual exception, to achieve monopoly; and (b) conduct which is so invidious as to almost, but not quite, satisfy the criteria for per se liability developed in ¶ 836.

(3) Claims involving 50 percent or larger market shares should presumptigvely be treated as attempts where the conduct requirements of ¶¶ 825–830 are also satisfied." Areeda & Turner at ¶ 835c.

This later Areeda and Turner quotation is included not to show that this Court agrees or disagrees with these attempted objective guidelines. The quotation is included to illustrate the role of market share in the determination of market power as it applies to attempted monopoly cases. All these rules are qualified as not helpful if predation can be shown. Additionally, predatory pricing is presumed not to have occurred if market circumstances will not

**3.** Areeda and Turner suggest those two exceptions should be those for instance in which it is clear that the challenged conduct will achieve market power and where there is clearly invid-

ious conduct. *See* 3 Areeda & Turner at ¶ 836a. Areeda and Turner further suggest that the predatory pricing is invidious.

permit later recoupment of the losses resulting from the pricing. Areeda and Turner can but caution that "...if predation can't be successful [market circumstances would not permit later recoupment], we may reasonably presume that it has not occurred, even before we inquire into price-cost relationships." Areeda & Turner ¶ 836b.

Thus, the concept of dangerous probability of success is intertwined with predation and intent.

*Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579 (7th Cir.1971) says this about the dangerous probability test:

"A reliable or accurate measure of the actual likelihood that plaintiff would have achieved monopoly status if Beall's wrongful conduct had never been disclosed is, of course, not possible. However, we do not understand the 'dangerous probability' test to involve an evaluation of the actual likelihood that an attempt would have succeeded if not frustrated by an intertwining event. Rather, it requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions. In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." *Id.* at 598.

*Kearney* involved a patent wherein the court found that the patent was procured "by violation of conflict of interest principles." The character of that conduct was the predatory act, not the pricing. *Kearney* is quoted and applied in *Lektro–Vend Corp. v. Vendo Co., supra,* for the above principles. In any case, the relationship of the three requirements for prevailing in an attempted monopoly cause of action is clearly shown. There must be present intent to control prices in order to recoup the cost of predatory behavior with a dangerous probability of successfully recouping.

This cause is presented to the Court on defendant Kroger's Motion For Summary Judgment. The United States Supreme Court has recently addressed through a trilogy of cases the summary judgment standard. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) the Court approved of the summary judgment granted by the district court in a complex antitrust action dealing with both § 1 and § 2 of the Sherman Act. The case involved claims that Matsushita and other Japanese electronic manufacturers had conspired to drive their American competitors from the American market by charging predatory prices for consumer electronic products exported from Japan to the United States. The other two cases approving grants of summary judgment within different legal contexts are *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). These cases taken together provide the guidance from which the instant case may be resolved. A statement from *Celotex Corp. v. Catrett* is illustrative and sets the tone for this summary judgment analysis. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." 106 S.Ct. at 2555. The *Celotex* court had just prior stated:

"the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation there can be 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* at 2252–2253.

Under *Celotex* then, defendant Kroger's motion which was properly made and supported by affidavits and references to dis-

covery responses, must be met with affidavits and discovery responses of admissible evidence showing a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.* adds to these procedural guidelines. The Supreme Court says:

"Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are the jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." 106 S.Ct. at 2513.

This quotation follows the statement of the rule that there is no genuine issue for trial unless a properly instructed jury could return a verdict for the non-moving party.

The Honorable William W. Schwarzer, United States District Judge, Northern District of California, in his article *Summary Judgment and Case Management*, 56 Antitrust L.J. 213 (1987) focuses on the Court's use of the phrase "justifiable inferences" in dealing with the import of *Anderson, supra.* Judge Schwarzer says "Upon analysis *Anderson* is simply an application of the same rationale that underlay the earlier decision in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* that undisputed evidence submitted by a plaintiff may be insufficient to sustain a verdict which turns on a mixed question of law and fact under the applicable substantive law." 56 Antitrust L.J. at 218.

Judge Schwarzer's analysis is of assistance in the instant case. He finds the issue in the above three cases to be the same, i.e., "whether as a matter of substantive law or policy, the court should permit a jury to draw from the undisputed material facts the inferences necessary to sustain liability." *Id.* at 218–19. He suggests the courts answer the following questions:

"(1) whether evidentiary or historical facts material to the disposition of the motion are disputed;

(2) if not, whether the mixed question of fact and law arising under the governing substantive law must be submitted to the jury."

He offers no easy guidelines to separate these mixed questions of law and fact into those appropriate for the jury and those appropriate for the judge. He does suggest that *Anderson* and *Zenith* indicate the need to probe for elements of substantive law and policy that may circumscribe the freedom of the jury to reach an adverse finding. He writes:

"Other factors that may determine on which side of the line an issue falls include whether the issue calls for the application of a regulatory scheme or other technical considerations, the interpretation of a statute or a written instrument, or consistency and adherence to precedent. These kinds of issues, although involving fact questions, are often treated as questions of law. On the other hand, questions involving reasonableness of human conduct, the adequacy of care exercised by a person, and the timeliness of action are the kinds of fact questions within the common experience of jurors and normally left for decision at trial." *Id.* at 220.

The instant case is one wherein certain behavior is alleged to be violative of antitrust law. The facts regarding the behavior itself are not materially at issue. The behavior of Kroger is admitted. At issue are the inferences to be drawn from the behavior. These inferences deal with issues of intent, predation and dangerous probability of success; statements are facts, pricing is a fact, market definition and share are taken as facts. The inferences are the precise mixed law and fact questions referred to in the previously cited article. The issues of fact are the same as the issues of law, namely, is there an intent to monopolize, was the pricing predatory, and was there a dangerous probability of success. Under Judge Schwarzer's analysis, this is not a question of the rea-

sonableness of conduct. Whether Kroger's responses to Cub's entry were reasonable or not isn't the issue. The issue is not a question of timeliness of action or the adequacy of care exercised. The issues are of substantive law and policy, interpretation of statute and adherence to precedent. In *Matsushita* the Supreme Court has determined that the inferences are already limited by the very fact that this case is an antitrust case.

Specifically, the Supreme Court in *Matsushita* recognized the need for a competing inference in antitrust cases, i.e., a competing inference to the traditional summary judgment inferences which favor the nonmoving party. That inference is necessary because the substantive law from the statute and precedent is reflective of competing economic benefits of controlling a given market and allowing it to remain uncontrolled, and reflective of the policymaking difficulty inherent in determining what is competitive and what is anticompetitive. The inference is that the factual behavior of the defendant was motivated by competitive rather than monopolistic intent. "Respondents in this case, in other words, must show that the inference of conspiracy [illegal behavior] is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357.

A further limitation on inference in antitrust cases is that the inference of monopolistic intent under all the facts must be a plausible inference.

"It follows from these settled principles that if the factual context renders respondent's claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary [to defeat a summary judgment motion]." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

Having set out the facts in the instant case and having reviewed the three proofs necessary for a finding of attempted monopoly, an attempt will be made to determine for summary judgment purposes the plausibility of plaintiffs' proffered inference that Kroger Co. is an attempted monopolizer as measured against the competing inference that the company is a legitimate, albeit tough, competitor.

The Supreme Court in *Matsushita* has recognized that matters of antitrust substantive law and policy reflected in statutory language and precedent require a closer scrutiny in antitrust litigation at the summary judgment level. Of particular importance in an antitrust case is the question of whether a party can properly overcome an inference of competitiveness by reliance on an inference of intent from behavior they insist is per se predatory and again rely on that same inference to support an inference of dangerous probability of success. This Court thinks the answer to that question is no.

An examination of plaintiffs' evidence and argument will reveal further why this motion for summary judgment must be granted.

Plaintiffs argue in this case that they have substantial evidence that Kroger engaged in predatory pricing. They accuse Kroger of engaging in the "deliberate sacrifice of present revenue for the purpose of driving rivals out of the market and then recouping the losses through higher prices earned in the absence of competition." It should be noted again that the "higher prices" of which the law is concerned are the prices required to recoup the losses created by the low pricing and set not according to free market forces. *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., supra, Lektro–Vend Corp. v. Vendo, supra, MCI Communications v. American Tel. & Tel., supra.*

As proof of the predatory nature of Kroger's pricing, plaintiffs allege that Kroger priced below its average variable costs as part of its strategy upon the entrance of defendant Super Valu into the market place. Plaintiffs' expert, Dr. Bruce Marion, divides the Indianapolis market into four zones. Plaintiffs' expert accountant, Robert L. Grottke, concludes that in three of those four zones Kroger priced its prod-

ucts below its average variable costs. For purposes of the summary judgment, the Court will treat Dr. Marion's market definitions as factual and Grottke's average variable cost conclusions as factual.

Plaintiffs, using these guidelines, then point out that Kroger, on the entry of Super Valu in the west submarket, dropped its prices below average variable costs in seven nearby Kroger stores for six 4–week accounting periods. Kroger then raised its prices in those stores to levels above average variable costs but below total costs. Plaintiffs allege and the Court will take as true that when Cub entered the east submarket, Kroger dropped prices below variable costs in five stores for four 4–week accounting periods. In the south submarket, they did the same in three stores for two 4–week accounting periods. Plaintiffs admit that if the Indianapolis market is not divided into four zones, and the total Indianapolis market is considered together, there can be no showing that Kroger's pricing was below average variable costs.

Plaintiffs argue that evidence of pricing below average variable costs is the single best test of predation and refer the Court to Areeda and Turner, 88 Harv.L.Rev. at 733[4], for the notion that this pricing should be conclusively presumed unlawful. Plaintiffs' expert economist, Dr. Marion, is cited for additional inferences of predation. Professor Marion concludes Kroger intended to eliminate weaker competitors and intended to protect and expand its market share in response to Super Valu's entry. Plaintiffs point out Kroger sales rose in seven Kroger stores in the west zone by 54 percent from 1983 to 1986 and that there were similar gains in the east and south zones. Plaintiffs further urge that in the west submarket, Kroger kept its prices below total cost for almost a year and a half, in the east submarket for one year and one month, and in the south for more than a year. Kroger kept its prices below total cost in the entire Metropolitan Statistical Area (MSA) for twelve 4–week periods.

Plaintiffs' expert concludes that Kroger's pricing is predatory. He bases that judgment on the pricing itself, its persistence, the growth in Kroger's sales, the existence of barriers to entry, and the level of concentration in the market.

Plaintiffs urge that the average variable cost standard is a substitute for intent since tests solely based on intent are unworkable, citing MCI, 708 F.2d at 1113. They cite Chillicothe, 615 F.2d at 431–32, for the notion that cost-based standards provide an objective means for distinguishing between (1) pro-competitive price-cuts that are intended to maximize short run profits or minimize short run losses, and (2) prices that make the seller worse off in the short run and can therefore be justified only by their effects on competition and the goal of later raising prices to above normal levels. From this, plaintiffs wish to draw the inference that Kroger was pricing for the purpose of harming competition.

To sum up, plaintiffs believe that since they can show evidence of pricing below average variable costs in three of four submarkets for up to 24 weeks and since they can show pricing below total costs for over almost a year in the total Indianapolis market and since a cost-based theory of predation is the best proof of intent, they are entitled to a presumption that the second half of the definition of predation is present. That is, that Kroger's goal was to recoup its losses from above competitive prices in the future.

Addressing initially the argument by plaintiffs that defendant Kroger engaged in predatory conduct, the concept of predatory pricing must be examined. The previous quotation from Areeda and Turner re per se predation from low pricing has been elaborated upon in P. Areeda & H. Hovenkamp Antitrust Law ¶ 711.2c, (Supp.1987):

"Indeed the main text confined itself to possible predation by a monopolist, and most commentators have taken the position that predatory pricing is plausible strategy only for a firm that begins with

**4.** Areeda and Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman* *Act,* 88 Harv.L.Rev. 697 (1975).

a very substantial market share. Although no single market share number can be offered as a guaranteed minimum below which predation is exceedingly unlikely, it seems reasonable to presume that a market share below 60 percent is too small to make predation likely."

Areeda & Turner's treatise does not, in contravention to plaintiffs' assertion, support plaintiffs' view that from Kroger's pricing predation can be presumed. Plaintiffs have no support for their argument that Kroger's pricing was per se predatory. Plaintiffs have not shown that the inference of anticompetitive predation excludes the inference of legal competitive behavior. They have not shown predatory acts. Plaintiffs' predation argument may work in theory, but it does not work in practice. It does not work because there is no evidence in the record from which it could be plausibly inferred that Kroger intended to or could have recouped its losses in a competitor free market.

Professor Areeda in his article *Monopolization, Mergers and Markets: A Century Past and the Future*, 75 Calif.L.Rev. 959 (1987), further defines the issue:

"To be predatory it is generally agreed that a price must be below the short-run profit maximizing level and must discipline or destroy rivals such that the predator thereafter gains sustained excess (that is, monopoly) profits far larger than those lost during the rival-bashing period. The uncertain future gains must greatly exceed the present actual losses to overcome the uncertainty that rivals will be destroyed or disciplined and that monopoly profits can be reaped in the face of future entry. If rivals survive or entry occurs, not only will predation be unsuccessful, but the very prospect reduces the likelihood that a challenged low price is in fact predatory. Whenever the market circumstances make such predation unlikely, it is probably absent." *Id.* at 965.

Further, at p. 967,

"Although sacrifice of short-run profits is a necessary condition for the existence of predation, not every such sacrifice is predatory. A firm might charge less than it could get away with in the short-run to forestall government price ceilings, to discourage long-run substitution of other products, or to expand the market."

Here again is the well accepted notion that the predatory behavior is not itself predatory unless the predator intends to recoup and if unabated will acquire the ability to recoup his losses in a non-competitive market. Here, again, is a reasonable, competitive motive for Kroger's pricing behavior, to increase market share and make increased profit from increased profits at competitive prices which we have seen is neither predatory nor against antitrust laws.

Michael Malina, as if in anticipation of this very case, in an article entitled *Some Thoughts on Monopoly, Markets and Mergers*, 75 Calif.L.Rev. 997 (1987), discusses the element of intent and costs and echos the Supreme Court's summary judgment concerns:

"But with this sound shift of focus from the seller's hard-to-prove intentions to his demonstrable costs, there is a serious risk that, in the guise of protecting competitors from predation, courts will deprive the consumer of the lower cost prices that antitrust ultimately seeks to promote. For that reason, the Supreme Court recently reminded us in the *Matsushita* case that a price below incremental cost is predatory only if it is likely to lead to supracompetitive price and excess profits once the monopolist has eliminated his competition." *Id.* at 1001.

There is no per se predatory pricing in this case.

Dr. Marion offers some instructive evidence on the issue of predatory conduct. At page 27 of his deposition he states that he thought Kroger intended to drive fringe competition from the market but not all competitors. At page 10 of his Statement of Opinions of May 20, 1987, on Kroger's intent to recoup, he says:

"Over time, I expect both Kroger and Cub will increase prices, gross profits and net profits. Whether Kroger will

raise prices above pre-Cub level is not clear. I do believe they will be able to raise prices above the level they would have, absent the price war between Kroger and Cub that eliminated several competing supermarkets, substantially weakened others and raised market barriers."

This, it seems to the Court, falls short of evidence that Kroger engaged in predatory conduct or intended to so engage because there is no evidence that Kroger intended to be able to set its prices above competitive levels so as to recoup the losses it suffered to the detriment of the consumer. Dr. Marion would not infer the intent to do so nor the possibility of successfully doing so. The possibility of unrecouped losses is very real in this case. To inflict losses on oneself doesn't appear to be an antitrust violation. To do so intentionally, creating the possibility of recouping from monopoly pricing, appears to be the violative behavior.

> "Competition is a ruthless process. A firm that reduces cost and expands sales injures rivals—sometimes fatally. The firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit. These injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds. The antitrust laws are for the benefit of competition and not competitors." *Ball Memorial*, 784 F.2d at 1338.

In law the plaintiffs are not entitled to either a presumption or an inference that Kroger intended to recoup its pricing loses from monopoly power pricing. Dr. Marion would not infer it. Such an inference would clearly be implausible under *Matsushita*. There is no evidence therefore that defendant's conduct was predatory.

■ The weakness of plaintiffs' case can be shown further by addressing the intent requirement. Intent, culpable intent, is the intent to control prices and exclude competition, and the Court will look to see the evidence presented by the plaintiffs on both issues. Plaintiffs begin their argument on this issue by stating that they have evidence that Kroger intended to sacrifice revenues and recoup losses. This evidence, they say, is both direct and circumstantial.

Plaintiffs argue that intent to monopolize can itself be inferred from Kroger's pricing practices, citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir.1981). This is simply not the law in the Seventh Circuit. *MCI, supra.* There is no doubt that there are three requirements for proof of an attempted monopoly in the Seventh Circuit.

Plaintiffs next cite various statements of Kroger executives pointing out that Kroger embarked on an aggressive course. Kroger executive Ted Engle is quoted as writing of the need to impress Super Valu. "Needless to say, this will take a significant investment in gross margins and net profit to prevent him (Super Valu) from taking away a substantial portion of our sales. If we can do this, then it is logical to assume that at some point in the future we should be able to move gross margins to a more profitable level." Kroger 1984 Business Plan.

Plaintiffs cite Kroger's Indianapolis market net loss projection for 1984 of eleven million dollars and for that period between 1984 and 1986 as twenty million dollars. Plaintiffs must then wish the Court to infer that Kroger expected to be able to recover its losses by exercising monopoly power since the losses were so high. This argument is in direct contrast to the previously cited expectations of their expert, Dr. Marion, who had no opinion on the level of pricing going above pre-Cub (Super Valu) entry. Plaintiffs are not entitled to a summary judgment defeating inference that since there was a loss Kroger would have recouped it with monopoly pricing. This does not defeat the competing inference that the loss could be recouped by increased profits from increased sales at competitive prices.

■ Plaintiffs say that the Kroger business plans show gross profits rising from an intent to increase market share. Intent to increase market share by itself is not

intent to monopolize. *Ball Memorial Hospital, supra. Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). They again point out anticompetitor statements. These statements amount to no more than those found by *Lektro–Vend Corp. v. Vendo Co., supra,* to be unharmful without establishing also predatory behavior or a dangerous probability of success:

> "Finally, appellants rely upon various statements made by Vendo officials which are scattered throughout the voluminous record in this case. In the first place, we would not necessarily regard all of the appellants' examples as evidence of specific intent to monopolize. Secondly, while some of the references might arguably support a finding of specific intent if the evidence had established the existence of predatory acts or dangerous probability, we cannot say that the district court's finding of no specific intent was clearly erroneous in light of the plaintiffs' failure to establish these other factors. We agree with the Fifth Circuit's affirmation in *Hayes v. Solomon,* 597 F.2d 958 (5th Cir. 1979)...that a statement of intent to compete,...even if perceived as a threat, is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation." *See Agrashell, Inc. v. Hammons Products Co.,* 479 F.2d 269, 285 (8th Cir.) *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973) (Court attaches little significance to statement that the other party "had no right in the walnut shell business. This is my domain.") *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir.1971) (Court characterizes remark that the defendant would drive the plaintiff out of business if it chose to compete as a "manifestation of intent to triumph in the competitive market, [which] in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish a violation of § 2.)" *Lektro–Vend,* 660 F.2d at 255.

Plaintiffs try to find the requisite intent to recoup from Kroger's projections of profit after the building of new stores. Nowhere do plaintiffs maintain that these projections show a pricing structure that would operate independent of a competitive market. At best they show an intent to increase profit through increased market share.

Plaintiffs then wish to infer intent from Kroger's failure to analyze the antitrust implication of their planned actions. Plaintiffs cite *Tasty Baking Co. v. Ralston Purina, Inc.,* 653 F.Supp. 1250 (E.D.Pa.1987). Therein the Court was aware of such an analysis but was never treated to written copies. Such is not the case at hand. Intent in this instance cannot be inferred plausibly from a failure of antitrust planning.

On the issue of intent plaintiffs' proof fails to override a competing inference that Kroger's behavior was legitimate competitive behavior. Intent cannot be inferred from the pricing behavior nor from the competitive statements of Kroger executives nor from an intent to increase market share.

Plaintiffs finally argue that there was a dangerous probability that Kroger would gain monopoly power and injure consumers. An analysis of that argument shows the same lack of proof as the recoupment issue. They argue that that probability should be inferred from specific intent, the specific intent being inferred from the predatory pricing. There can be no question that "dangerous probability of success" is in fact an independent element of attempted monopoly. *Ball Memorial Hospital, supra, Lektro–Vend, supra.* Plaintiffs want a presumed intent from a per se illegal pricing scheme with an inferred dangerous probability of success. The Court rejects that invitation as not meeting the *Matsushita* summary judgment standard. A per se rule not adopted by this Circuit will not support an inference on presumption and thus defeat a summary judgment motion.

■ Plaintiffs spend quite a bit of time pointing out that Kroger has disciplined

competitors and therefore has violated antitrust law. The discipline complained of is no different than the destroying of competitors. In order for the behavior to be a violation of § 2 it must be done with the intent to control prices and destroy competition so that losses sustained thereby may be recouped by the exercise of monopoly pricing.

■ The element "dangerous probability of success" requires the analysis previously set out in *Kearney, supra.* It requires an analysis of the market and defendant's ability to succeed in controlling prices above market factors. The market in this case is a retail market. It is a retail market with at least three strong players; plaintiffs, 24 stores, Super Valu (Cub), 4 stores, and Kroger, 33 stores. It is a market with other players, Marsh, 30 stores, Joe O'Malia, 9 stores, Mr. D's, 5 stores, Aldi, 5 stores, and Seven–Eleven, 4 stores. It is a market of which plaintiffs' economic expert, Bruce Marion, said, "There is no evidence that Kroger thought they could prevent Cub from successfully entering ..." (Marion Aff., ¶ 21) It is a market in which Super Valu had enormous staying power (Marion Dep., p. 485). It is a market, accepting plaintiffs' figures, of which Kroger has less than one-half. On this evidence and the statement of Dr. Marion, regarding price levels, it is not plausible to believe Kroger had or has a "dangerous probability of success."

Analysis of dangerous probability of success further requires an understanding of the concept of monopoly power. Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. DuPont deNemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The Supreme Court in *DuPont* went on to say that every seller of nonfungible commodities has "power over the price and production of his own product," but this is "not the power that makes an illegal monopoly." *Id.* at 393, 76 S.Ct. at 1006. The plaintiffs' evidence on monopoly power comes from Dr. Marion. When asked at pages 50 to 52 of his deposition, "Now is it your position that Kroger has

the power to control prices in Indianapolis" he replied, "No." He later said, "I'm not suggesting that Kroger can dictate or control marketwide prices or prices in any trading area just by itself."

■ In sum, plaintiffs' burden is to present evidence from which a rational trier of fact could conclude that (1) defendant Kroger had the intent to destroy competition and control prices, (2) Kroger committed predatory acts with the intent to injure competition and to recoup losses from elevating prices in a non-competitive market and (3) there was a dangerous probability of Kroger achieving these goals. Plaintiffs' response to defendant's motion for summary judgment is devoid of evidence that Kroger intended to recoup losses from pricing behaviors by doing anything other than increasing market share. Plaintiffs' response is devoid of any evidence that Kroger preyed on competition with the intent to recoup losses by raising profits above competitive levels as no one has suggested that pre-price-war prices weren't competitive or that post-war prices will exceed pre-war prices. Plaintiffs' response is devoid of any evidence that Kroger came dangerously close to acquiring the forbidden monopoly power as there remains a market with at least two strong participants in Kroger and Super Valu and other participants in Marsh's, Mr. D's, O'Malia's, Indiana Grocery and Preston–Safeway, Aldi's and Seven–Eleven.

The Court GRANTS defendant Kroger's Motion for Summary Judgment on Count I for the foregoing reasons.

Having granted the Motion for Summary Judgment of Kroger addressed to Count I, the Court now moves to a consideration of the Motions for Summary Judgment by defendants Kroger, Super Valu Stores, Inc. and Markkay of Indiana, Inc. on Counts II and III of the Amended Complaint.

Count II alleges that Cub Foods and Kroger have engaged in a pricing which plaintiffs characterize as predatory pricing with the intent and/or effect of injuring the plaintiffs and driving them out of business. Plaintiffs complain that that alleged predatory pricing conduct by Cub Foods

and Kroger constitutes unfair competition. Plaintiffs further accuse Cub Foods in Count II of engaging in price discrimination with the intent and/or effect of injuring Indiana Grocery and Preston–Safeway and driving them out of business. They allege that that price discrimination constitutes unfair competition. They allege that the unfair competition by defendants has injured their business.

Count III alleges a tortious interference with business relationships and prospective business advantages. Count III alleges that the defendants Cub Foods and Kroger knew or had reason to know that the plaintiffs had valid and established business relationships with their retail grocery customers. It alleges that Cub Foods and Kroger acted with the purpose of interfering with the plaintiffs' prospective advantage in plaintiffs' relationships with their customers. It alleges that no legitimate business reason justified the defendants' predatory pricing. It further alleges that the predatory pricing constitutes tortious interference with plaintiffs' business relationships and prospective business advantages. Finally, it alleges that the plaintiffs lost customers and suffered injury to their business as a result of the defendants' predatory pricing and interference with plaintiffs' relationships with their customers.

■ It appears to this Court that Indiana law does not recognize low pricing as a common law tort and this Court will decline to exercise its pendent jurisdiction over the plaintiffs' common law claims.

■ The pricing scheme of Kroger being complained of in Counts II and III is the same scheme complained of in Count I. The scheme of Super Valu and Markkay is not quite the same. Plaintiffs allege the Markkay store sold its products at below their average variable costs for 4 months and below its average total costs for 14 months. Plaintiffs allege Super Valu caused its products in their Cub Foods' store in the east zone to be sold at below average variable costs for some 45 days and below total costs for 13 months. Plaintiffs allege that Super Valu caused its

products in the south zone to be sold at below average total costs for approximately 16 months. As in their argument under Count I, plaintiffs feel a characterization of pricing as predatory carries with it both allegations and beneficial inferences of culpable intent to injure rivals and competition. Indiana courts have rejected this approach.

Plaintiffs in their memorandum rely strongly on the case of *Karges Furniture v. Amalgamated Woodworkers Local Union No. 131*, 165 Ind. 421, 75 N.E. 877 (1905) for the proposition that Indiana law recognizes "underselling can be tortious where its purpose is to injure a rival." A complete statement of the law from the *Karges* case provides:

"If the same tradesman, singly or with others, advertises his goods, undersells, solicits, and wins away the customers of his rival by false representation, intimidation or artifice, not to better himself, but to injure his rival, he has committed an actionable wrong." 75 N.E. at 879–80.

The gravamen of the tort, therefore, is underselling by means of false representation, intimidation or artifice, not underselling in and of itself. The acceptance of the plaintiffs' use of the *Karges* case at face value would amount to a finding that Indiana law would prohibit one competitor from underpricing another competitor in order to outsell that competitor.

The Court can find no assistance from the plaintiffs' citation to *Indiana State Fair Board v. The Hockey Corporation of America*, 165 Ind.App. 544, 333 N.E.2d 104 (1975), *vacated on other grounds*, 429 N.E.2d 1121 (Ind.1982). In that case, which does not involve any charge of price cutting, the court explained that the tort of unfair competition is one that applies to claims of passing off and other similar situations involving consumer deceit. 333 N.E.2d at 108. The Prosser (Prosser, Law of Torts (4th Ed.1971), hereinafter "Prosser") quotation contained in *Indiana State Fair Board, supra*, 333 N.E.2d at 109, shows his broad concerns, indicating that "... where the defendant is not seeking to

acquire the business diverted from the plaintiff for himself, but to gratify ill will or further some unrelated interest ...", the tort claim ought to exist. It appears that Prosser's concern is that the motive of the action by the defendant is important, that the business diverted from the plaintiff is not being sought just to increase the defendant's market share but to gratify ill will or for some further unrelated purpose. Nowhere in the amended complaint is it alleged that the defendant's motive for its pricing in Indianapolis was ill will toward the plaintiffs. To the contrary, the plaintiffs have alleged that Kroger and Super Valu were motivated by profit, not by ill will.

In *Durakool, Inc. v. Mercury Displacement Industries, Inc.*, 422 N.E.2d 680 (Ind. App.1981), the court announced that:

"[t]he test of unfair competition is whether the acts of the defendant are such as are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates." *Id.* at 682, n. 3.

This Court refuses the invitation of the plaintiffs to expand the tort law of the state of Indiana in the discretionary exercise of pendent jurisdiction, there being no allegations of deceit or ill will in plaintiffs' complaint in Count II.

The Court therefore GRANTS Kroger's, Super Valu's and Markkay's Motions For Summary Judgment on Count II of the plaintiffs' Amended Complaint for the same reason.

Plaintiffs have alleged in Count III that the defendants' pricing scheme previously discussed in the Court's opinion amounts to a tortious interference with the plaintiffs' business relationships by the defendants. Plaintiffs contend that a tortious interference with prospective business advantage claim will survive a motion to dismiss if the allegations are either that the defendants' sole motive in causing the interference was a desire to harm the plaintiff or that the means used in effecting the harm were illegal. *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532 (7th Cir.1986)

contradicts plaintiffs' position. In *Great Escape*, at 542–43, the Court reviewed the Indiana law on the nature of the tort, and concluded:

"We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still under Indiana cases be something 'illegal' about the means employed."

Citing Prosser, the Court said illegality means "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law." *Id.*

Plaintiffs have failed to satisfy their pleading requirement in this Count. The Court has already found tht defendants did not engage in predatory pricing. Plaintiffs' claim is therefore deficient as it alleges no illegal behavior. All that is alleged is that Kroger lowered its prices. The absense of an allegation of illegal behavior is fatal. There is nothing inherently tortious about reducing prices.

Defendant Kroger Company's, defendant Super Valu Stores, Inc.'s and defendant Markkay's Motions For Summary Judgment on Count III are GRANTED.

In Count IV, the plaintiffs allege that the defendants Super Valu and Markkay are corporations independent of one another and that they are competitors in the Indianapolis market. They allege that by agreement Super Valu controlled the prices of Markkay and that this agreement and the conduct pursuant to it equaled unreasonable restraining of trade to fix prices among competitors in violation of § 1 of the Sherman Act. Defendants Super Valu and Markkay maintain that the plaintiffs, as the competitors of the defendants, have no standing to challenge any alleged agreement to set low prices unless the agreement was to set prices predatorily.

Plaintiffs have responded that because price fixing is illegal per se, they have standing as competitors to recover damages under § 1 of the Sherman Act without a showing that the alleged agreement was predatory. Plaintiffs do not suggest that they are prepared to prove any agreement to set prices at a predatory level. The

standard of review for an antitrust summary judgment was discussed by the Court in Count I.

■■■ Under the case of *Brunswick Corporation v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) competitors may sue other competitors under the antitrust laws only when their business losses derive from "injury of the type the antitrust laws were intended to prevent." *Id.* at 489, 97 S.Ct. at 697. The antitrust laws are designed to benefit consumers by encouraging low prices, not to protect competitors. *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697.

The threshold issue in this cause is whether or not a competitor as opposed to the government has standing to attack an agreement to set low prices absent an allegation of predation. This issue has been addressed recently by the United States Supreme Court in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

In *Matsushita,* a case involving an alleged horizontal price fixing agreement among Japanese manufacturers to sell their goods at low prices in the United States, the Supreme Court made clear what the standard requirement was: "respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief ... That showing depends in turn on proof that the petitioners conspired to price predatorily in the American market." *Matsushita, supra* 475 U.S. at 584, n. 7, 106 S.Ct. at 1355 n. 7 (citations omitted).

*Cargill* involved a claim by one competitor against two others to enjoin a merger alleging that it was threatened with the possibility that, after the merger, the defendants would lower prices to cost or above cost in an attempt to increase their market share. The Supreme Court analyzed the plaintiff's allegations under two theories of injury:

"1) a threat of a loss of profits stemming from the possibility that Exel, after the merger, would lower its prices to a level at or only slightly above its costs;

2) a threat of being driven out of business by the possibility that Exel, after the merger, would lower its prices to a level below its costs." 107 S.Ct. at 491.

The Court rejected both theories. As to the first theory, the Court said:

"*Brunswick* holds that the antitrust laws do not require the court to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws. The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition. To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "it is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." 107 S.Ct. at 492 [citations omitted].

The Court rejected the second theory because there was no evidence of predatory pricing.

■■■ Herein the plaintiffs admit that no evidence exists of predatory pricing. Their claim is that they lost market share and suffered greater losses than they would have under what they term legal competitive conditions (plaintiffs' Brief In Opposition, p. 54). Therefore, plaintiffs' claim in the instant action is akin to plaintiff's claim in *Cargill,* i.e., loss of market share and profit as a result of defendants' low prices. The *Cargill* quote applies herein. Small businesses are not protected from loss of profits due to continued vigorous competition. The courts do not protect competitors from practices not forbidden by antitrust laws. Loss of market share is not by itself a protected loss.

The issue has been addressed by the case of *Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698 (7th Cir.1984).

In *Jack Walters* the plaintiff attacked an alleged vertical price fixing agreement to set low but not predatory prices. The court found that Walters did not suffer an injury of the type which the antitrust laws were intended to forbid. The court found that the loss to Walters from lawful price competition was a gain to consumers and stated: "Walters will not be heard to complain about having to meet lawful price competition which antitrust law seeks to encourage merely because the competition may have been enabled by an antitrust violation." *Id.* at 708–09. The United States Supreme Court also recently addressed this issue in the *Matsushita* case, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538.

Plaintiffs argue that the agreement entered into by the defendants was a price fixing agreement which was illegal per se, thus meeting the standing requirement of an injury which the antitrust laws were intended to prevent. The plaintiffs base their argument on *Arizona v. Maricopa Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). In that case the Court found that the maximum fee price fixing agreements entered into by two county medical societies representing approximately 70% of the county's doctors were per se unlawful under § 1 of the Sherman Act. The Court there said: "The per se rule 'is grounded on faith in price competition as a market force.'" *Id.* at 348, 102 S.Ct. at 2475 (citation omitted). The Court was unpersuaded by the argument that the agreements were alleged to have pro-competitive justifications. *Id.* at 351, 102 S.Ct. at 2476–77. However, in the 1987 supplement to their treatise on antitrust law, Areeda and Hovenkamp, whom both plaintiffs and defendants cite frequently in their pleadings and papers, specifically addressed the situation set forth in *Arizona* and said:

"For example, imagine that physicians agree upon their maximum prices, which the Supreme Court has condemned as per se unlawful because it tampers with the market or because the price fixed might be a disguised minimum. In addi-

tion, a maximum price fix can limit the provision of services consumers desire. Suppose that a rival physician attacks the price-fixers and proves that he lost patients who shifted their patronage solely because the defendant physicians offered lower prices. Such injury-in-fact proximately caused by the illegal price fix is not antitrust injury, because protecting high-price suppliers against lower-priced competition desired by consumers is not an injury that the antitrust laws are designed to prevent, nor does it flow from the rationale for condemning maximum price fixing." Areeda & Hovenkamp, *Antitrust Law,* ¶ 335.1c at 263 (1987 Supplement) (footnotes omitted).

They went on to note that the only exception to this rule might arise if the prices were fixed at a predatory level. *Id.*, n. 27. Of course, there is no such allegation of predatory pricing in this Count. In light of this and relying on the recent decisions in *Jack Walters* and *Matsushita,* this Court is not persuaded by the plaintiffs' reasoning and reliance on the *Arizona v. Maricopa County Medical Society* case.

 Any injury which the plaintiffs suffered in this case was as a result of lawful price competition, not as a result of anything forbidden by the antitrust laws. The purpose of the antitrust injury standing requirement is to carve out instances where even though there may be an antitrust violation and resulting injury, the allowance of recovery would be inimical to the purposes of the antitrust laws. *Brunswick, supra,* 429 U.S. at 488, 97 S.Ct. at 697. Thus, the Court here finds that the plaintiffs have not met the standing requirement and cannot recover for a § 1 violation.

Having so found, the Court hereby GRANTS summary judgment to defendants Super Valu and Markkay on Count IV.

In Count V, the plaintiffs allege that the defendants Super Valu and Markkay conspired to monopolize the Indianapolis market and geographic submarkets in violation of § 2 of the Sherman Act. In *Great Escape, supra,* at 540–541, the Seventh Circuit Court of Appeals stated that the plaintiff must prove the following for a conspiracy to monopolize claim:

"1) the existence of a combination or conspiracy;

2) overt acts in furtherance of the conspiracy;

3) an effect upon a substantial amount of interstate commerce; and

4) the existence of specific intent to monopolize."

The Court went on to state: "...the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize." 791 F.2d at 541. Here the plaintiffs withdrew their attempted monopolization claim against the two defendants after the plaintiffs' expert concluded that the pricing practices employed by Super Valu and Markkay were not predatory. The plaintiffs have not suggested in their opposition to summary judgment that they will seek to introduce any evidence to support the existence of defendants' specific intent to monopolize. Having failed to satisfy their burden as to an essential element, the plaintiffs' § 2 claim must fall.

The Court hereby GRANTS summary judgment to the defendants Super Valu and Markkay on Count V.

 Count VI of the plaintiffs' Amended Complaint alleges a civil conspiracy between the defendants Super Valu and Markkay alleging that they have combined and conspired to accomplish unlawful purposes or lawful purposes through unlawful means. Plaintiffs further allege that defendants have conspired to fix their prices and the prices have been predatory and intended to injure competition and defendants' competitors.

Indiana law is clear that "there is no cause of action for conspiracy as such." *Indianapolis Horse Patrol, Inc. v. Ward*, 247 Ind. 519, 217 N.E.2d 626, 628 (1966). "If the complaint is to state a valid cause of action, the plaintiff must allege that the defendants conspired to accomplish an unlawful purpose or a lawful purpose by unlawful means." *Durakool, Inc.*, 422 N.E. 2d at 682. The unlawful means alleged in this count of the complaint is the price fixing at predatory levels with the intention of injuring competitors. That same allega-

tion provided the basis of the plaintiffs' fourth and fifth counts. Again, no Indiana precedent establishes price fixing or predatory pricing as a tort. Such conduct is unlawful only if it violates § 1 or § 2 of the Sherman Act. The Court rejects plaintiffs' invitation to expand the state law in Indiana not recognized by controlling Indiana precedents.

The Motions by the defendants Super Valu and Markkay for summary judgment on Count VI are therefore GRANTED.

Count VII of the amended complaint alleges essentially the same price discrimination claim that was dismissed by this Court in its entry of June 18, 1986. The Court now GRANTS summary judgment to defendants Super Valu and Markkay on Count VII for the same reasons set out by Judge Barker in her opinion of June 18, 1986, found at 647 F.Supp. 254.

### ORDER OF DISMISSAL

The Court, having on this date entered its Judgment Entry in this cause,

IT IS ORDERED that the plaintiffs take nothing by their complaint against the defendants and their complaint is now dismissed with prejudice.